KELLY GOODWIN CLARK, Executrix of the Estate of JAMES LESTER GOODWIN, Plaintiff v. WESLEY FOUST-GRAHAM, Defendant

No. COA04-1266

(Filed 19 July 2005)

**1. Annulment; Estates— annulment action—continuing after death—authority of executrix**

A marriage annulment action did not abate upon the death of one of the parties (Goodwin) where the action was commenced prior to the Goodwin's passing and substantial property rights hinge on the validity of the marriage. Moreover, N.C.G.S. § 28A-18-1 permits the personal representative of a decedent to bring an action which survives his death and the plaintiff here was entitled to pursue the annulment in her capacity as executrix of the estate.

**2. Annulment— grounds—undue influence**

A marriage may be annulled on the ground of undue influence when warranted by the facts and circumstances. The trial court here did not err by submitting undue influence as a potential ground for annulment.

**3. Annulment— undue influence—right to marry—state's right to regulate marriage**

Permitting a marriage to be voided where the consent to marry was procured by undue influence neither significantly interferes with the right to marry nor unconstitutionally exceeds the state's prerogative to impose reasonable regulations upon the right to marry.

**4. Annulment— jury findings—consent—undue influence—not inconsistent**

Jury findings that the 80-year-old deceased had expressed a willingness to marry the 40-year-old defendant at the ceremony but that the consent was not freely given because of undue influence were not inconsistent.

**5. Annulment— no birth of issue—not precluded by statute**

A marriage annulment based on undue influence was not precluded by N.C.G.S. § 51-3 where the marriage was followed by cohabitation but not the birth of issue.

Appeal by defendant from judgment entered 5 April 2004 and order entered 11 May 2004 by Judge A. Robinson Hassell in Guilford County District Court. Heard in the Court of Appeals 24 March 2005.

*Booth Harrington & Johns, L.L.P., by A. Frank Johns, for plaintiff appellee.*

*Smith, James, Rowlett & Cohen, LLP, by Norman B. Smith, for defendant appellant.*

McCULLOUGH, Judge.

Defendant Wesley Foust-Graham appeals from a district court order annulling her marriage to the late James Lester Goodwin. We affirm.

Facts

Wesley Foust-Graham and James Goodwin were married by a Guilford County magistrate on 12 April 2002. At the time of the mar-

riage, Foust-Graham was approximately forty years of age, and Goodwin was eighty. Goodwin died on 23 October 2003.

Prior to Goodwin's death, his daughter Kelly Clark, acting as his guardian *ad litem*, filed an action on his behalf to annul the marriage on the grounds of incompetency, lack of consent, undue influence, and impotence. After Goodwin's death, Clark filed a motion to substitute herself as plaintiff in her capacities as the executrix of Goodwin's estate and beneficiary entitled to take under his will. The trial court permitted Clark to continue the suit in her role as the executrix of Goodwin's estate, but denied her motion to be substituted as a beneficiary under his will.

The evidence at trial tended to show the following: Foust-Graham and Goodwin met in 2001. Goodwin owned a considerable amount of real estate, and Foust-Graham, a real estate broker, inquired as to his willingness to sell some of his property. A business relationship ensued pursuant to which Foust-Graham listed, and occasionally sold, property for Goodwin.

For reasons that Foust-Graham has characterized as "personal and professional," she and defendant began spending more time together during the early months of 2002. In March of 2002, the woman who lived with and cared for Goodwin, Sally Cross, decided that she needed to get away from Goodwin because he began verbally abusing her. Before leaving, Cross telephoned Foust-Graham and asked her to "see to [Goodwin's] needs." Thereafter, Foust-Graham began cooking for Goodwin, doing his grocery shopping, washing his laundry, and helped with the feeding of his animals. She also cleared a room in his house for use as an office. By April of 2002, Foust-Graham was spending as many as ten to twelve hours each day at Goodwin's home and also speaking with him on the telephone each day. According to Foust-Graham, she became so consumed by Goodwin that she had little time to do anything else.

On the day that Foust-Graham and Goodwin were married, Goodwin telephoned a business acquaintance, John Waldrop, and told him, "I need you to come to the magistrate's office immediately. They're locking me up . . . . I'm in trouble. They are locking me up. I need you to come down here and get me." During the same telephone call, Waldrop's girlfriend, Shirley Swaney, ended up speaking to Foust-Graham, who admitted that Goodwin was not in jail but told Swaney that she and Goodwin needed help. Waldrop and Swaney then drove to the magistrate's office; Goodwin and Foust-Graham

were not there to meet them. A few minutes later, Foust-Graham drove up in a black pick-up truck with Goodwin in the passenger's side. Foust-Graham then got out of the truck with "an armful of papers." Once they had all entered the magistrate's office, Foust-Graham asked Waldrop and Swaney to be witnesses for the marriage.

Waldrop and Swaney were concerned because Foust-Graham was African-American, and Goodwin had previously told them that he did not like black people, and he had commonly used derogatory racial epithets in their presence. Prior to the ceremony, Swaney said to Goodwin, "I thought you told me you didn't like n------s," to which Goodwin replied, "I don't." Goodwin later stated, "She's not black." Waldrop and Swaney did not believe that Goodwin was taking the ceremony seriously because, among other things, he danced "a little jig" after the magistrate pronounced Goodwin and Foust-Graham husband and wife. Following the ceremony, Foust-Graham told Waldrop and Swaney not to contact Goodwin's family because they "wouldn't understand."

Plaintiff's witness, Dr. Michelle Haber opined that, by late 2001, Goodwin was exhibiting signs of Stage II dementia and Alzheimer's disease. This opinion was based upon his conduct at the marriage ceremony and information that Goodwin occasionally got lost in familiar places, claimed to know very little about gardening when he had kept a garden all of his life, and stopped talking in favor of permitting Foust-Graham to speak on his behalf. Dr. Haber further opined that because of his condition, Goodwin would have been very inclined to "go along" with sexual advances. There was evidence that Goodwin procured Viagra as early as 22 March 2002, and that Foust-Graham sometimes went to get Goodwin's prescriptions for Viagra filled. There was also evidence that in early May of 2002, after the marriage, Foust-Graham and Goodwin engaged in actual or attempted sexual activity before going to an attorney and having some of Goodwin's property holdings converted into property held by the two of them as a tenancy by the entirety. Foust-Graham provided testimony from which the jury could infer that Goodwin was competent to enter into the marriage, that he freely consented to the marriage, and that she and Goodwin successfully engaged in sexual intercourse approximately one month following the marriage. Likewise, she denied exerting any undue influence over Goodwin.

A jury returned a verdict in Foust-Graham's favor with respect to the issues of competency, consent, and impotence. However, the jury found that Foust-Graham procured the marriage to Goodwin by

exerting undue influence upon him. Accordingly, the trial court entered an order annulling the marriage. The trial court also denied Foust-Graham's motion for judgment notwithstanding the verdict. From these orders, Foust-Graham now appeals.

I.

**[1]** In her first argument on appeal, Foust-Graham contends that an action to annul her marriage to Goodwin could not be maintained by Goodwin's executrix following his death. We do not agree.

"No action abates by reason of the death of a party if the cause of action survives." N.C. Gen. Stat. § 1A-1, Rule 25(a) (2003). Generally, "[the] right[] to prosecute or defend any action or special proceeding, existing in favor of or against [a deceased] person . . . shall survive to and against the personal representative or collector of his estate." N.C. Gen. Stat. § 28A-18-1(a) (2003). Thus, an annulment action survives unless it is a "cause[] of action where the relief sought could not be enjoyed, or granting it would be nugatory after death." N.C. Gen. Stat. § 28A-18-1(b) (2003). The North Carolina Supreme Court has held that an action for annulment may be commenced after the death of a person entitled to an annulment "by a person or persons whose legal rights depend upon whether [the] marriage is valid or void." *Ivery v. Ivery*, 258 N.C. 721, 730, 129 S.E.2d 457, 463 (1963) (holding that a decedent's brother and heir-at-law could bring an action to annul decedent's marriage based on incompetency).

We note also that the statute which establishes the grounds for annulling a marriage does not preclude an action for annulment based upon the death of one of the wedded parties. Rather, the statute provides that"[n]o marriage followed by cohabitation and the birth of issue shall be declared void after the death of either of the parties for any . . . cause[] . . . except for bigamy." N.C. Gen. Stat. § 51-3 (2003). A plain reading of this statute evinces the Legislature's intent to bar a postmortem annulment action brought by a sufficiently interested party only if (1) one of the spouses in a void or voidable marriage has died, **and** (2) the marriage was followed by cohabitation and the birth of issue.

Likewise, we observe that, in many cases, the granting of an annulment cannot be considered nugatory relief. Indeed, as a practical matter, the marital status of a decedent may greatly influence the distribution of his estate, and the execution of his testamentary wishes may hinge on whether a challenged marriage is adjudged valid or void. *See, e.g.*, N.C. Gen. Stat. § 29-30 (2003) (entitling a surviving

spouse to choose between an intestate share or an elective share and a life estate in one-third of the real estate of which a deceased spouse was seized during coverture); N.C. Gen. Stat. § 30-3.1 (2003) (entitling surviving spouse of a decedent to claim an elective share of the decedent's estate); N.C. Gen. Stat. § 30-15 (2003) (entitling surviving spouse of an intestate or a testator to a year's allowance of $10,000 payable out of the personal property of the deceased spouse); N.C. Gen. Stat. § 31-5.3 (2003) (entitling surviving spouse of a testator to petition for an elective share of the testator's estate if the will was executed prior to the marriage).

In the instant case, Clark initiated annulment proceedings on Goodwin's behalf as his guardian *ad litem* while Goodwin was still living. Following Goodwin's death, Clark moved to substitute herself as plaintiff in her capacity as the executrix for Goodwin's estate, and the trial court granted this motion. Given that the annulment action was commenced on Goodwin's behalf prior to his passing, and substantial property rights hinge on the validity of the marriage between Goodwin and Foust-Graham, we conclude that the action for annulment did not abate upon Goodwin's death. Moreover, given that N.C. Gen. Stat. § 28A-18-1 permits the personal representative of a decedent to bring an action which survives his death, we conclude that Clark, in her capacity as executrix of Goodwin's estate, was entitled to pursue Goodwin's annulment suit.

This assignment of error is overruled.

II.

**[2]** In her second argument on appeal, Foust-Graham contends that the trial court erred by submitting the issue of undue influence to the jury because a marriage may not be voided based upon a finding of undue influence. We do not agree.

The marriage of a person who "is at the time incapable of contracting from want of will" is voidable. N.C. Gen. Stat. § 51-3 (2003); *Ivery*, 258 N.C. at 730, 129 S.E.2d at 463 (holding that such a marriage "is not void *ipso facto*; but, if and when declared void in a legally constituted action, . . . is void *ab initio*"). Thus, for example, it is generally accepted that in North Carolina a marriage procured by duress is voidable because one of the parties suffered from want of will. *See* SUZANNE REYNOLDS, 3 LEE'S NORTH CAROLINA FAMILY LAW § 3.22 (5th ed. rev. 1993) (applying N.C. Gen. Stat. §§ 51-1 and 51-3 and the common law of contracts); *Taylor v. White*, 160 N.C. 38, 40, 75 S.E. 941, 942 (1912) (" 'All marriages procured by force or fraud, or

involving palpable error, are void[able], for here the element of mutual consent is wanting, so essential to every contract.' ") (citation omitted). Significantly, our Supreme Court has characterized duress as "the extreme of undue influence." *In re Estate of Loftin*, 285 N.C. 717, 722, 208 S.E.2d 670, 674-75 (1974). However, neither the Supreme Court, nor this Court, has addressed whether undue influence is a ground for annulment.

Undue influence is said to exist where there has been "a fraudulent influence over the mind and will of another to the extent that the professed action is not freely done but is in truth the act of the one who procures the result." *Id.* " 'There are four general elements of undue influence: (1) a person who is subject to influence; (2) an opportunity to exert influence; (3) a disposition to exert influence; and (4) a result indicating undue influence.' " *In re Will of Dunn*, 129 N.C. App. 321, 328, 500 S.E.2d 99, 104 (citation omitted), *disc. review denied in part and dismissed in part*, 348 N.C. 693, 511 S.E.2d 645 (1998). Our Supreme Court has identified the following factors as relevant in determining whether a testamentary document was the result of undue influence:

"1. Old age and physical and mental weakness [of the victim].

2. That the [alleged victim] is in the home of the beneficiary and subject to his constant association and supervision.

3. That others have little or no opportunity to see [the victim].

4. That the will is different from and revokes a prior will.

5. That it is made in favor of one with whom there are no ties of blood.

6. That it disinherits the natural objects of his bounty.

7. That the beneficiary has procured its execution."

*In re Andrews*, 299 N.C. 52, 55, 261 S.E.2d 198, 200 (1980) (citation omitted).

Where these circumstances have been present, undue influence has been recognized as a potential ground for the postmortem invalidation of action taken during a decedent's life. *See In re Will of Sechrest*, 140 N.C. App. 464, 469, 537 S.E.2d 511, 515 (2000) (will caveats), *disc. review denied*, 353 N.C. 375, 547 S.E.2d 16-17 (2001); *Dunn*, 129 N.C. App. at 327-28, 500 S.E.2d at 103-04 (will revocations). Significantly, undue influence has also been recognized as a potential ground for nullifying documents executed by persons in anticipation

of marriage or divorce. *Loftin*, 285 N.C. at 722-23, 208 S.E.2d at 674-75 (prenuptial agreement); *Coppley v. Coppley*, 128 N.C. App. 658, 664-66, 496 S.E.2d 611, 617 (separation agreements), *disc. review denied*, 348 N.C. 281, 502 S.E.2d 846 (1998).

Consistent with the definition of undue influence and the application of the doctrine by the courts of this state, we hold that if a person's consent to marry was procured by undue influence, he was "incapable of contracting from want of will," such that the marriage is voidable pursuant to N.C. Gen. Stat. § 51-3. Accordingly, a marriage may be annulled on this ground where the facts and circumstances so warrant.

In the instant case, there was evidence pertaining to each of the factors which our Supreme Court has identified as relevant in analyzing undue influence. *See Andrews*, 299 N.C. at 55, 261 S.E.2d at 200. Specifically, Goodwin was elderly at the time of the marriage, and there was testimony tending to establish that he was suffering from dementia and/or Alzheimer's disease. It is not disputed that he was subject to constant association with, and supervision by, Foust-Graham and that he had little association with his family or friends in the months immediately preceding the marriage. The marriage left Goodwin's previously existing estate plan in doubt and placed Foust-Graham in a position to take action that would substantially reduce the amount that Goodwin's daughter would inherit. Further, there was evidence that Foust-Graham procured the marriage, including Goodwin's apparent confusion as to why he was at the magistrate's office, the fact that Foust-Graham had driven Goodwin to the magistrate's office, and the fact that the marriage was undertaken suddenly. Accordingly, the jury could find that Goodwin was subject to undue influence, that Foust-Graham had the opportunity and disposition to exert undue influence, and that the marriage occurred as a result of undue influence. *See Dunn*, 129 N.C. App. at 328, 500 S.E.2d at 104 (setting forth elements of undue influence). As a finding of undue influence is tantamount to a finding that Goodwin was incapable of contracting from want of will, the trial court did not err by submitting undue influence to the jury as a potential ground for annulment.

This assignment of error is overruled.

### III.

Throughout her brief, Foust-Graham also makes several miscellaneous assertions in support of her main arguments on appeal. We note that these assertions also lack merit.

**CLARK v. FOUST-GRAHAM**

[171 N.C. App. 707 (2005)]

**[3]** For example, Foust-Graham contends that construing "want of will" to include a decision procured by undue influence is inconsistent with the constitutionally protected status of marriage. Though the United States Supreme Court has held that states may not unreasonably infringe upon the right to marry, it has expressly rejected the notion that "every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny." *Zablocki v. Redhail*, 434 U.S. 374, 386, 54 L. Ed. 2d 618, 631 (1978). "To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." *Id.* Permitting a marriage to be voided where the consent to marry was procured by undue influence neither significantly interferes with the right to marry nor unconstitutionally exceeds the state's prerogative to impose reasonable regulations upon the right to marry.

**[4]** Likewise, Foust-Graham insists that the jury's verdict is inconsistent inasmuch as it found that Goodwin did not marry without giving his consent but also found that Foust-Graham exerted undue influence upon him. In essence, the jury declined to invalidate the marriage due to lack of consent where the evidence tended to show that Goodwin expressed a willingness to marry Foust-Graham at the wedding ceremony, but found that Goodwin's consent, although given, was not freely given because he was the victim of undue influence exerted by Foust-Graham. We are unpersuaded that these findings are inconsistent.

**[5]** Foust-Graham further argues that, notwithstanding the foregoing analysis, her marriage to Goodwin was unassailable because there was evidence tending to show that their nuptials were followed by cohabitation and sexual intercourse, and such post-marriage activity was sufficient to preclude annulment. As already indicated, N.C. Gen. Stat. § 51-3 provides that "[n]o marriage followed by cohabitation and the birth of issue shall be declared void after the death of either of the parties for any . . . cause[] . . . except for bigamy." It follows that a marriage procured by the undue influence of one of the spouses is nevertheless invulnerable to an attack on this ground if either of the parties is dead and the marriage was followed by **both** cohabitation **and** the birth of issue. In the instant case, however, there was no evidence tending to show the birth of issue into the union between Foust-Graham and Goodwin. As such, N.C. Gen. Stat. § 51-3 does not preclude an annulment based on undue influence. *See Ivery*, 258 N.C. at 730, 129 S.E.2d at 463 ("In the instant case, the marriage . . . was

followed by cohabitation but not the birth of issue. Hence, the second proviso of N.C. Gen. Stat. § 51-3 does not apply.").

In addition, we have considered the remaining arguments in Foust-Graham's brief and have determined that they lack merit. The corresponding assignments of error are overruled.

## IV.

In conclusion, given the facts and circumstances of the instant case, we hold that (1) the executrix of Goodwin's estate was entitled to continue his action for annulment following his death, and (2) the trial court did not err by submitting undue influence to the jury as a potential ground for annulment. This holding makes it unnecessary for us to address the cross assignments of error presented. The trial court's order is

Affirmed.

Judges HUNTER and LEVINSON concur.