**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### No. 18-2139

TERENCE WILLIAMS,

       Plaintiff – Appellant,

v.

DIMENSIONS HEALTH CORPORATION, trading as Prince George's Hospital Center,

       Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, District Judge.  (8:16-cv-04123-PWG)

Argued:  January 28, 2020                 Decided:  March 13, 2020

Before DIAZ, THACKER, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Quattlebaum wrote the opinion in which Judge Diaz and Judge Thacker joined.

**ARGUED:**  Jon Wyndal Gordon, LAW OFFICE OF J. WYNDAL GORDON, PA, Baltimore, Maryland, for Appellant.  Christian W. Kintigh, DOWNS WARD BENDER HAUPTMANN & HERZOG, P.A., Hunt Valley, Maryland, for Appellee.  **ON BRIEF:** Mary Alane Downs, DOWNS WARD BENDER HAUPTMANN & HERZOG P.A., Hunt Valley, Maryland, for Appellee.

QUATTLEBAUM, Circuit Judge:

Shortly after midnight on May 3, 2014, Terence Williams was seriously injured when his vehicle rolled over in a single-vehicle accident. Williams' most serious injuries were to his lower body. He was subsequently transported to Prince George's Hospital Center (the "Hospital") in Prince George County, Maryland. He arrived at the Hospital at 1:33 A.M., and Hospital staff began screening procedures. Within twenty minutes, he was intubated to protect his airway, and a trauma surgeon performed a right antecubital cutdown to insert a catheter to infuse large volumes of fluid and blood quickly. After the insertion of the catheter, Williams was repeatedly given blood for the next several hours. Between 2:21 A.M. and 2:57 A.M., various CT scans were performed on his head, chest and spine. At 3:23 A.M., Williams was removed off the back board provided by paramedics in the field. At the same time, he was given additional units of blood and plasma. Twenty minutes later, x-rays were performed on his chest, abdomen, pelvis, forearm, femur, spine, tibia and fibula. After the x-rays, Williams was transported to the operating room and began receiving anesthesia. At 5:13 A.M., Williams' first surgery began and lasted more than six hours. Although the formal documentation is ambiguous, at some point on May 3, Williams concedes he was admitted to the Hospital.

For the next eleven days, Hospital staff performed a variety of surgeries and medical treatments on Williams. On May 13, 2014, he was transferred to the University of Maryland Medical Center. Despite the treatment he received at the Hospital and at the University of Maryland, the injuries to Williams' lower body required amputating both of Williams' legs.

2

Williams sued the Hospital in state court, alleging it violated the Emergency Medical Treatment and Active Labor Act ("EMTALA") by failing to properly screen him and stabilize his condition. The Hospital removed the case to federal court and then moved to dismiss Williams' complaint.

The district court granted in part and denied in part the Hospital's motion. It treated the motion as a motion for summary judgment because Williams attached exhibits to his opposition that were not attached or referenced in his complaint. It then held that the Hospital was entitled to judgment as a matter of law on Williams' failure to screen claim: "[The hospital] followed its own standard screening procedures when it provided an initial screening for Williams. Whatever shortcomings Williams may perceive in the physician assistant's screening or the physicians' involvement, those are matters for a medical malpractice action, and outside the scope of an EMTALA action." J.A. 153. The district court denied the Hospital's motion with respect to Williams' failure to stabilize claim, holding "until a patient is transferred, discharged, or admitted, 'the Hospital must provide that treatment necessary to prevent the material deterioration of each patient's emergency medical condition.'" J.A. 155 (citing *In the Matter of Baby K*, 16 F.3d 590, 596 (4th Cir. 1994)). As the district court explained, "[a]t some point, . . . Williams was admitted to the hospital. Thus, [Williams] has stated a claim for failure to stabilize, given that it is plausible that the Hospital failed to stabilize his emergency medical condition *before* it admitted him, such that his condition materially deteriorated." J.A. 157 (emphasis added).

The Hospital later moved for summary judgment on the remaining stabilization claim. The district court granted the Hospital's motion noting that "contrary to [its]

3

understanding when [it] considered the parties' argument for the Hospital's first dispositive motion," the timing of a patient's admission to the hospital is not essential because the good faith admission of an individual as an inpatient is a complete defense to an EMTALA failure to stabilize claim. J.A. 237. Without determining the exact time, the district court found that Williams was in fact admitted and held that Williams failed to present evidence that created a genuine issue of material fact about the Hospital's good faith in admitting Williams. Thus, the district court granted the Hospital's motion for summary judgment.

Williams filed a timely notice of appeal on June 29, 2018, and we have jurisdiction under 28 U.S.C. § 1291. On appeal, Williams raises a single, narrow issue, arguing that his admission to the Hospital lacked good faith.[1] For the reasons set forth below, we affirm the district court.

I.

Before analyzing the good faith admission issue presented here, we briefly describe EMTALA and its requirements. Congress enacted EMTALA in 1986 to prevent patient dumping, a practice by which hospitals would either refuse to provide emergency medical treatment to patients unable to pay for treatment or transfer those patients before their emergency medical conditions were stabilized. *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d

---

[1] We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to Williams. *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 947 F.3d 234, 237 (4th Cir. 2020).

139, 142 (4th Cir. 1996); *Bryan v. Rectors and Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996).

In keeping with this purpose, EMTALA imposes two main obligations on hospitals with emergency rooms. First, EMTALA requires a hospital to screen an individual to determine whether he has an emergency medical condition. 42 U.S.C. § 1395dd(a) provides:

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. § 1395dd(a). EMTALA defines emergency medical condition as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
> (ii) serious impairment to bodily functions, or
> (iii) serious dysfunction of any bodily organ or part;

42 U.S.C. § 1395dd(e)(1)(A).

Second, EMTALA requires a hospital to stabilize an individual's emergency medical condition in certain limited circumstances. 42 U.S.C. § 1395dd(b)(1) provides:

> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--

5

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b)(1).

Critically, EMTALA defines "to stabilize" as "to provide such medical treatment of the [emergency medical condition] as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result *from or occur during the transfer* of the individual from a facility . . . ." 42 U.S.C. § 1395dd(e)(3) (emphasis added). EMTALA defines transfer as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person." 42 U.S.C. § 1395dd(e)(4). Thus, under the statute itself, "the stabilization requirement *only* sets forth standards for transferring a patient in either a stabilized or unstabilized condition. By its own terms, the statute does not set forth guidelines for the care and treatment of patients who are not transferred." *Harry v. Marchant*, 291 F.3d 767, 771 (11th Cir. 2002) (emphasis in original).

Consistent with this definition, this Court in *Bryan v. Rectors and Visitors of University of Virginia*, 95 F.3d 349 (4th Cir. 1996), held that EMTALA's stabilization requirement is "defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system." *Id.* at 352. Elaborating on the scope of the requirement, this Court held:

6

> It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment. *It cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context.*

*Id*. (emphasis added).[2]

Subsequent regulations from the Centers for Medicare & Medicaid Services (the "CMS") confirm the limited scope of the stabilization requirement.[3] A 2003 final rule from the CMS adopted the approach of *Bryan* and the approach of other circuits, including *Harry*, providing "should a hospital determine that it would be better to admit the individual as an inpatient, such a decision would not result in a transfer or a discharge, and, consequently, the hospital would not have an obligation to stabilize under EMTALA." CMS Final Rule, 68 F.R. 53222-01, 2003 WL 22074670, at *53244 (F.R. Sept. 9, 2003). This codified rule provides:

> If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual.

---

[2] Although Williams relies on *In the Matter of Baby K*, 16 F.3d 590 (4th Cir. 1994) to argue for a broader stabilization requirement, he misconstrues its holding. As explained in *Bryan*, "[t]he holding in *Baby K* thus turned entirely on the substantive nature of the stabilizing treatment that EMTALA required for a particular emergency medical condition. The case did not present the issue of the temporal duration of that obligation, and certainly did not hold that it was of indefinite duration." 95 F.3d at. 352.

[3] The CMS, as part of the Department of Health and Human Services, has the congressional authority to promulgate rules and regulations interpreting and implementing EMTALA. *Torretti v. Main Line Hospitals, Inc*., 580 F.3d 168, 174 (3d Cir. 2009).

42 C.F.R. § 489.24(d)(2)(i).

But, importantly, the regulations refer to an admission that is "in good faith." Thus, while the CMS clarified that admission is a defense to a stabilization claim, it, at the same time, imposed a good faith requirement to that admission. Explaining this requirement further, the CMS cautioned that a hospital cannot admit an individual solely to evade liability under EMTALA:

> However, a hospital cannot escape liability under EMTALA by ostensibly "admitting" a patient, with no intention of treating the patient, and then inappropriately transferring or discharging the patient without having met the stabilization requirement. If it is discovered upon investigation of a specific situation that a hospital did not admit an individual in good faith with the intention of providing treatment (that is, the hospital used the inpatient admission as a means to avoid EMTALA requirements), then liability under EMTALA may attach.

68 F.R. 53222-01, 2003 WL 22074670, at *53245. This regulation confirmed that a hospital's admission of a patient for treatments effectively acts as a defense to an EMTALA claim. But the CMS also articulated what might be described as a defense to the defense— the requirement that the admission be in good faith. Under that requirement, Williams' claim might survive summary judgment if he can show that the Hospital's admission was not in good faith. We now turn to that question.

## II.

On appeal, Williams does not argue that the Hospital failed to admit him on May 3, 2014. Instead, he challenges the district court's conclusion that his admission was in good

8

faith.[4] In arguing his admission was not, Williams asserts that his admission was based on non-medical reasons. More specifically, he argues the Hospital failed to provide the full number of specialized on-call doctors required by law and by its internal procedures; the Hospital's trauma surgeon, who was available on call, refused to perform surgery; and the Hospital attempted to hoard Williams as a patient to collect his premium insurance benefits. Appellant Br. at 14.

Before addressing the merits of Williams' argument, we must first determine whether the good faith admission requirement applies in this Circuit. While both parties assume that it does, we have an independent obligation to assess the viability of the requirement in light of our precedent and applicable regulations. Our Court has yet to address the requirement of good faith admission under EMTALA, and it is not expressly set forth in the statute. But, based on several circuit court decisions, including our *Bryan* decision, the CMS's 2003 regulation explained that the defense to an EMTALA claim based on the admission of the patient requires that the admission be in good faith. This requirement appears to have the force and effect of law in an area where Congress has not

---

[4] Although Williams maintains that he is solely appealing the district court's determination that his admission was in good faith, to the extent that he argues that the hospital breached its duty to stabilize, his argument must fail because the hospital admitted him as a patient. While the record is not entirely clear about the precise time of his admission, Williams concedes he was admitted to the hospital on May 3, receiving extensive treatments and surgeries throughout that day and for another ten days thereafter. As explained above, a hospital has no obligation under EMTALA to stabilize a patient's emergency medical condition once the patient is admitted. Instead, relief for any criticisms of treatment fall in the area of state medical malpractice law.

directly spoken on the issue. Therefore, we apply *Chevron* deference to the CMS's regulation, concluding that the CMS's interpretation of EMTALA is permissible. *See Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 174 (3d Cir. 2009).[5] The good faith admission requirement seems to flow logically from the text and the intent of EMTALA and from our *Bryan* decision. *Bryan* makes clear that EMTALA's obligations end once a patient is admitted for treatment. The good faith requirement simply clarifies that any admission must be legitimate and not in name only. While not heretofore an express part of our Circuit's concept of admission, the good faith requirement seems at least implicit in it. Therefore, deferring to the CMS's regulation, we conclude that while a patient's admission for treatment terminates EMTALA's obligations, the admission must be in good faith.

Having adopted the requirement of a good faith admission, we must next decide what is required to show a lack of good faith in patient admission under EMTALA. The 2003 CMS final rule provides that the standard is high, finding that EMTALA liability may attach when a hospital ostensibly admits a patient "with no intention of treating the patient, and then inappropriately transfer[s] or discharg[es] the patient without having met the stabilization requirement." 68 F.R. 53222-01, 2003 WL 22074670, at *53245. That standard is consistent with the approach of the Ninth Circuit. *See Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1169 (9th Cir. 2002) (holding liability under EMTALA may

_____

[5] Even under a lesser standard of deference, the regulation commands an ability to persuade given the purpose of EMTALA. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

attach if a patient demonstrates that inpatient admission was a ruse to avoid EMTALA's requirements). We agree and hold today that a party claiming an admission was not in good faith must present evidence that the hospital admitted the patient solely to satisfy its EMTALA standards with no intent to treat the patient once admitted and then immediately transferred the patient. In other words, the standard requires evidence that the admission was a subterfuge or a ruse. The standard is not satisfied by simply alleging or showing deficiencies in treatment following admission.

Here, Williams fails to point to evidence that creates a genuine issue of material fact as to this high standard. And our review of the record reveals no evidence that the Hospital admitted Williams as a subterfuge with no intent to treat him. In fact, the record demonstrates that Hospital staff provided extensive treatment and surgeries to Williams right after his arrival on May 3 and for the next eleven days. When Williams arrived, Hospital staff screened Williams and provided extensive resuscitative and diagnostic treatment in the form of infusions and scans between 1:30 A.M. and 4:00 A.M. Doctors then operated on Williams for over six hours trying to treat his condition. For the next ten days, Hospital staff provided additional treatment to Williams, including multiple surgeries.

What's more, the evidence Williams presented and the arguments he makes on appeal go to the quality of his treatment, citing complaints about the lack of qualified medical professionals and the treatment decisions of certain medical staff. More specifically, Williams contends that certain diagnostic treatment performed by hospital staff was unnecessary and that, instead, doctors should have started surgery sooner. As

11

noted above, this type of evidence is insufficient as a matter of law to establish a lack of good faith in patient admission under EMTALA. This evidence and these arguments bear all the hallmarks of a malpractice claim. To paraphrase a famous saying, if it walks like a malpractice claim and talks like a malpractice claim, it must be a malpractice claim. But EMTALA does not generally provide a vehicle for claims that are at their core malpractice in nature. *See* 68 F.R. 53222-01, 2003 WL 22074670, at *53244 ("The courts have generally acknowledged that this limitation on the scope of the stabilization requirement does not protect hospitals from challenges to the decisions they make about patient care; only that redress may lie outside EMTALA.").[6] For those claims, Williams must pursue recovery under state malpractice law.

Further, Williams failed to point to any evidence in support of his theory that the Hospital admitted Williams to improperly hoard him in order to garner his premium insurance benefits. In fact, this hoarding theory actually undercuts Williams' argument that his admission lacked good faith. If there was evidence the Hospital admitted Williams to hoard him, which we do not see in the record, that would mean that the Hospital admitted Williams not without the intent to treat him, but with the specific intent to treat him precisely because Williams had excellent insurance coverage. Such a claim, even if true,

---

[6] In certain limited cases, there may be some overlap between an EMTALA claim and a medical malpractice claim. *See Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 858–59 (4th Cir. 1994) (recognizing a potential for overlap between a failure to screen claim under EMTALA and a medical malpractice claim).

would represent the polar opposite of a bad faith admission, which, once again, is an admission without the intent to provide treatment and subsequent transfer.

In conclusion, although Williams has perhaps produced evidence questioning the Hospital's treatment of him, he has failed to produce evidence creating a genuine issue of material fact that his admission to the Hospital lacked good faith. Consequently, because the Hospital admitted Williams in good faith, it satisfied its obligations under EMTALA.

III.

For these reasons, the judgment of the district court is

*AFFIRMED.*