**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-2203

PEGGY ELROD; YVONNE BERTOLO; JANINE PALMER; JUSTIN PALMER, and all similarly situated persons within the proposed class,

        Plaintiffs – Appellants,

    v.

WAKEMED; WAKEMED SPECIALTY PHYSICIANS, LLC, d/b/a WakeMed Physician Practices; WAKEMED SPECIALISTS GROUP, LLC, d/b/a WakeMed Physician Practices; ARGOS HEALTH, INC.,

        Defendants – Appellees,

    and

ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; PENNSYLVANIA NATIONAL MUTUAL INSURANCE COMPANY; UNKNOWN DEFENDANTS 1 THROUGH 25,

        Defendants.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Louise W. Flanagan, District Judge. (5:20-cv-00413-FL)

Submitted: November 29, 2022              Decided: January 31, 2023

Before KING and AGEE, Circuit Judges, and Henry E. HUDSON, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

––––––––––––––

**ON BRIEF:**  Arlene L. Velazquez-Colon, Kendra Renee Alleyne, THE LAW OFFICE OF COLON & ASSOCIATES, PLLC, Wake Forest, North Carolina, for Appellants.  Matthew Nis Leerberg, Troy D. Shelton, Jeffrey R. Whitley, FOX ROTHSCHILD LLP, Raleigh, North Carolina, for Appellees Wake Med; WakeMed Specialty Physicians, LLC; WakeMed Specialists Group, LLC.  James C. Thornton, Steven A. Bader, R. Robert El-Jaouhari, CRANFILL SUMNER LLP, Raleigh, North Carolina, for Appellee Argos Health, Inc.

––––––––––––––

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Peggy Elrod, Yvonne Bertolo, and Janine Palmer on behalf of her minor son, Justin Palmer (collectively, "Patients"), sued WakeMed[1] and Argos Health, Inc. ("Argos"), alleging that an assignment of benefits ("AOB") that Patients signed with WakeMed is unenforceable. The district court dismissed the amended complaint under Federal Rule of Civil Procedure 12(b)(6). As explained below, we agree with the district court that dismissal was appropriate, although under Rule 12(b)(1) and (b)(6). Accordingly, we affirm.

I.

We begin with the allegations in the amended complaint, which we accept as true and construe in the light most favorable to Patients for Rule 12(b)(6) purposes.[2] *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 608–09 (4th Cir. 2020).

Following unrelated car accidents, Patients sought emergency medical treatment from WakeMed, an emergency-room ("ER") healthcare service provider. WakeMed required Patients to execute a general consent form ("GCF") to obtain emergency treatment. The GCF indicated that, by executing the form, the patient "consent[ed] to the provision of all medical treatment and other health care that [his or her] physician(s) or

---

[1] Patients sued various entities related to WakeMed that we refer to collectively as "WakeMed."

[2] Relevant evidence related to WakeMed's Rule 12(b)(1) motion is addressed below in note 5.

3

other caregivers consider[ed] necessary, which may include diagnostic, radiology, and laboratory procedures." J.A. 146. In relevant part, the GCF also included an AOB that provided:

> **Irrevocable Assignment of Insurance Benefits:** I, on behalf of myself and the patient, in consideration of health care services provided, voluntarily and irrevocably assign and authorize direct payment of all surgical and medical benefits directly to WakeMed . . . . I also authorize payment of applicable benefits directly to all physicians or other practitioners involved in my care . . . . Benefits assigned shall include, but may not be limited to, major medical insurance, liability insurance (including excess, umbrella and automobile uninsured/underinsured coverages), medpay[3] and personal injury protection (PIP) benefits.
>
> I understand this assignment means that WakeMed can and will seek and receive direct payment from any potential insurer or other payment source, which may limit what I can recover personally for my injury. . . . I authorize WakeMed, as necessary, to endorse benefit checks made payable to me and/or WakeMed or independent practitioner(s).

J.A. 146.

When Bertolo and Elrod presented at the ER following their car accidents, Bertolo had "severe pain" and "foggy memory," J.A. 118, and Elrod "was terrified and in a panicked state because of potential internal bleeding complications . . . posing a significant threat to life or function." J.A. 119. "[A]s a prerequisite for emergency medical treatment," they were asked to sign the GCF. J.A. 110. When they signed it, the form was visible only on a WakeMed employee's computer screen. The employee briefly explained each form to Bertolo and Elrod and directed them to sign on an electronic signature pad. The employee

---

[3] Medpay is a no-fault insurance benefit whereby an insured is provided with a lump-sum payment to assist with medical expenses following an accident.

4

did not point out that "they were signing away their rights to their Med Pay," J.A. 124, and Patients did not "thoroughly read" the GCF "due to their state of mind." J.A. 125. But they allege that even if they had read the GCF, "it is doubtful they would have understood the significance of the legal terms within the form under such circumstances." J.A. 125. Elrod and Bertolo "contend that if they had known, or been made aware, of the contractual provisions and their effect . . . , they would not have known what to do." J.A. 124.

As for Janine Palmer, after her son Justin was injured in a car accident, she saw him bleeding, strapped down to a gurney, and loaded into an ambulance. She then arrived at the ER to witness employees cutting off Justin's clothing and removing shards of glass from his skin, after which she was directed to sign a hard copy of the GCF. She alleged that "she was in such a state of shock and panic that she would have signed anything she was directed to sign under the impending fear that any delay on her part would delay the treatment her son critically needed." J.A. 124–25. Adding to her anxiety, a WakeMed employee brought a member of the clergy into the room while she was signing. According to the amended complaint, "[a]t no time was Mrs. Palmer made aware that signing this form would effectively forfeit the rights and benefits under her automotive insurance policy." J.A. 121.

After Patients were treated, WakeMed worked with Argos to send invoices for the services provided, plus the signed GCFs, to Patients' auto insurers, among others.[4] After determining that they had medpay coverage, Elrod and Bertolo's insurers sent checks to

---

[4] Argos is a separate corporation with whom WakeMed contracted to collect insurance proceeds on WakeMed's behalf.

5

WakeMed as payment toward their medical bills. Patients do not allege that the Palmers' insurers sent their medpay proceeds to WakeMed.[5]

Patients assert that WakeMed and Argos took advantage of their compromised state to force them to sign the GCFs to obtain medpay benefits to which WakeMed was not otherwise entitled. Patients claim that they "simply had no choice *but* to sign," even though they had no intention of assigning their rights under their insurance policies. J.A. 126.

Patients filed an amended class action complaint in November 2020, bringing five claims against WakeMed, Argos, and various insurers.[6] Patients sought a declaratory judgment that the AOB was void based on unconscionability, lack of mutual assent, lack of consideration, unilateral mistake, fraud, imposition, and public policy. Patients also brought a claim for breach of fiduciary duty against WakeMed and claims for fraud, conversion, and violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1 *et seq.*, against WakeMed and Argos.

WakeMed and Argos moved to dismiss under Rule 12(b)(1) and (b)(6), and the district court granted the motions on 12(b)(6) grounds.

On the declaratory judgment claim, the district court reasoned that Patients' signatures manifested their assent to the GCF. *Elrod v. WakeMed*, 561 F. Supp. 3d 592,

---

[5] For WakeMed's factual challenge to the Palmers' standing, WakeMed submitted evidence that no WakeMed entity received any medpay payments from the Palmers' insurers in connection with Justin's hospital visit. Instead, the Palmers' medpay coverage was paid to another provider before WakeMed attempted to collect the funds.

[6] The district court dismissed the claims against the insurers, a decision that Patients have not appealed. We therefore do not discuss these claims.

606 (E.D.N.C. 2021). The court also found adequate consideration based on the exchange of healthcare services for the AOB. *Id.* at 606–07. And in response to Patients' argument that WakeMed had a duty under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, to provide emergency services such that there was no additional consideration for the AOB, the court reasoned that, in the GCF, WakeMed promised to provide necessary medical services, which was more than required by EMTALA. *Elrod*, 561 F. Supp. 3d at 607–08.

The district court also rejected Patients' various contract-enforcement defenses. The court found that Patients failed to plausibly allege that the AOB was unconscionable where it performed a function permitted by law and was not harsh or one-sided. *Id.* at 611. On Patients' mistake, fraud, undue-influence, and diminished-capacity arguments, the court noted, among other flaws, that Patients did not identify any individual who concealed facts from them, did not allege that any WakeMed employee intended for them to rely on any purported concealment, and did not allege that they so relied in executing the GCF. *Id.* at 613. On Patients' undue-influence and duress claims, the court indicated that Patients alleged they were "directed" to sign the GCF, which did not give rise to a plausible inference of overpowering influence or a wrongful threat. *Id.* And on diminished capacity, the court explained that Patients did not plausibly allege that they could not make or communicate important decisions about themselves. *Id.* at 614.

Moreover, the court rejected Patients' argument that the AOB was unenforceable under the law governing Medicare. *Id.* at 608. The court reasoned that "by contracting to assign benefits payable from a primary insurer, defendant WakeMed [was] not engaging

7

in conduct prohibited by Medicare, but rather conduct that furthers the central purposes of the Medicare Secondary Payer Act." *Id.* at 609. Further, while Patients asserted that the AOB violated Medicare's private-contract provisions, there were insufficient allegations in the amended complaint establishing that, in contracting with Patients for the AOB, WakeMed was entering into a private contract as defined by applicable law. *Id.* at 609–10.

Finally, the district court noted that WakeMed sought dismissal of the Palmers' claims under Rule 12(b)(1) for lack of standing. *Id.* at 616 n.17. However, the court reasoned that the presence of one party with standing is enough to satisfy Article III and declined dismissal on that basis as to the Palmers. *Id.*

On appeal, WakeMed contends that, in addition to dismissing the amended complaint under Rule 12(b)(6), the district court should have dismissed the Palmers under Rule 12(b)(1) for lack of standing. Patients disagree and also argue (1) that the court should have found the GCF and AOB unenforceable or rescinded them based on various contract-formation and contract-enforcement defenses, and (2) that the court should have held that the GCF violated the law governing Medicare. We address each argument in turn.[7]

## II.

Initially, WakeMed argues that the district court erroneously concluded that because Elrod and Bertolo had standing, the court could overlook that the Palmers lacked standing.

---

[7] Patients do not appeal the dismissal of their fiduciary duty, conversion, and unfair-practices claims. We thus do not discuss these claims.

8

"We review de novo a district court's decision to deny a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, when the underlying facts are not in dispute," as is the case here. *Puryear v. Cnty. of Roanoke*, 214 F.3d 514, 517 (4th Cir. 2000).

To establish Article III standing, a plaintiff must identify (1) an injury that he or she suffered (2) that can be fairly traced to the defendant's conduct and (3) that will likely be rectified by the relief the plaintiff seeks. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In cases where each plaintiff seeks *identical* relief, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *see Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 217 (4th Cir. 2017). But where plaintiffs seek to recover *individual* relief such as individual damages—as is the case here—*each* plaintiff must establish standing. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021); *Wikimedia Found.*, 857 F.3d at 217.

Elrod and Bertolo plausibly allege standing: both allege that their insurers sent their medpay benefits to WakeMed based on the AOB such that their funds were diverted from them as a result of WakeMed's conduct. However, Patients do not allege that the Palmers' insurers paid their medpay benefits to WakeMed. Moreover, WakeMed submitted uncontested evidence that the insurers paid the Palmers' medpay benefits to another healthcare provider.[8] Therefore, the district court should have dismissed the Palmers for

---

[8] We may consider this evidence on a Rule 12(b)(1) motion. *Mowery v. Nat'l Geospatial-Intel. Agency*, 42 F.4th 428, 433 (4th Cir. 2022).

lack of standing under Rule 12(b)(1) for failure to trace their injury to WakeMed's allegedly unlawful conduct. While this is a separate and independent ground to affirm the dismissal of the Palmers, we also agree with the district court's conclusion that Patients failed to state claims on which relief can be granted. Consequently, we affirm the dismissal of Patients' claims—the Palmers, on 12(b)(1) and 12(b)(6) grounds, and Elrod and Bertolo, on 12(b)(6) grounds. *See Shing v. MD Developmental Disabilities Admin.*, 698 F. App'x 70, 71–72 (4th Cir. 2017) (per curiam) (affirming 12(b)(1) dismissal on 12(b)(6) grounds).

III.

Turning to the merits, Patients argue that the GCF is unenforceable due to lack of mutual consent and consideration and that it should be rescinded based on diminished capacity, unconscionability, duress, undue influence, and fraud.[9] We review de novo the grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Krueger v. Angelos*, 26 F.4th 212, 215 n.1 (4th Cir. 2022). Applying this standard of review and North Carolina substantive law,[10] we conclude that the district court properly dismissed the amended complaint.

---

[9] Patients also raise public-policy and mistake arguments but fail to develop them. They are therefore waived. *See Grayson O. Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by . . . failing to develop its argument—even if its [opening] brief takes a passing shot at the issue." (cleaned up)).

[10] The parties agree that North Carolina law governs Patients' state-law claims.

A.

First, the district court correctly concluded that Patients failed to allege a lack of mutual assent. Signing a document establishes a manifestation of assent to enter a written contract. *Branch Banking & Tr. Co. v. Creasy*, 269 S.E.2d 117, 123 (N.C. 1980). Patients signed the GCFs, and therefore their argument that they "never made an objective manifestation of their consent to the terms of the contract" fails. Opening Br. 18.

Patients further argue that by signing the GCF, they intended to receive emergency services but did not intend to assign their medpay benefits. This argument is a non-starter because assent to a contract is determined by a person's "outward expressions and excludes all questions in regard to his unexpressed intention." *Schwarz v. St. Jude Med., Inc.*, 802 S.E.2d 783, 790 (N.C. Ct. App. 2017) (citation omitted). Patients expressed their assent to the GCF through their signatures, and any unexpressed intent is thus irrelevant. *See id.*

Patients also contend that the existence of mutual assent is a jury question. But this is only true where a complaint alleges facts sufficient to plausibly demonstrate a lack of mutual assent at the 12(b)(6) stage. *See Audio Visual Assocs., Inc. v. Sharp Elecs. Corp.*, 210 F.3d 254, 261 (4th Cir. 2000) (finding that a complaint failed to allege mutual assent on a 12(b)(6) motion). And as just explained, Patients have not done that here. The district court therefore properly rejected Patients' declaratory judgment claim on that basis.[11]

---

[11] Although Patients argue that they could not voluntarily assent to the AOB under the circumstances, they cite no case law indicating that this argument relates to mutual assent as opposed to, for example, diminished capacity or procedural unconscionability.

11

B.

Second, the district court properly concluded that Patients failed to allege a lack of consideration. Consideration "consists of some benefit or advantage to the promisor, or some loss or detriment to the promisee," meaning that "the promisee, in return for the promise, does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do." *Penley v. Penley*, 332 S.E.2d 51, 59 (N.C. 1985) (emphases deleted). The AOB stated that "in consideration of health care services provided," Patients assigned their medpay benefits to WakeMed. J.A. 146. Patients also agreed that they were personally responsible for all charges. This language clearly evinces consideration: WakeMed promised to provide medical treatment—something it was not legally required to do—and in exchange, Patients agreed to pay for the treatment and gave WakeMed the right to collect on their medpay benefits.

Patients contend that the GCF only obliges WakeMed to provide "necessary" medical treatment such that the promise is illusory. A promise is illusory if the promisor "reserve[s] an unlimited right to determine the nature or extent of his performance." *State v. Philip Morris USA Inc.*, 685 S.E.2d 85, 96 (N.C. 2009) (cleaned up). WakeMed's promise here is not illusory because the GCF did not provide WakeMed with an "unlimited right" to determine what medical services it would provide. *Id.* Instead, WakeMed implicitly promised to provide services "in a reasonable manner based upon good faith and fair play." *Mezzanotte v. Freeland*, 200 S.E.2d 410, 414 (N.C. Ct. App. 1973).

Patients also argue that WakeMed had a preexisting duty to provide medical services under EMTALA such that its promise to provide medical services cannot be

12

consideration. It is true that "the promise to perform an act which the promisor is already bound to perform cannot constitute consideration to support an enforceable contract." *Virmani v. Presbyterian Health Servs. Corp.*, 488 S.E.2d 284, 287 (N.C. Ct. App. 1997). But WakeMed did not have a preexisting duty under EMTALA to provide all necessary medical treatment to Patients.

EMTALA states that when an individual comes to an ER, the hospital must provide screening to determine whether the individual has an emergency medical condition. 42 U.S.C. § 1395dd(a). If he or she does, the hospital must either provide "for such further medical examination and such treatment as may be required to stabilize the medical condition" or transfer the individual to a different facility. *Id.* § 1395dd(b)(1). The GCF clearly provides for the provision of healthcare services beyond EMTALA's screening and stabilization requirements. *Compare* J.A. 146 (describing "all medical treatment and other health care that my physician(s) or other caregivers consider *necessary*, which may include *diagnostic, radiology, and laboratory procedures*" (emphases added)), *with Williams v. Dimensions Health Corp.*, 952 F.3d 531, 534–35 (4th Cir. 2020) (describing EMTALA as imposing screening and stabilization requirements and noting that "the statute does not set forth guidelines for the care and treatment of patients who are not transferred").

Therefore, we agree with the district court that Patients failed to allege a lack of consideration.[12]

---

[12] Because we find that the exchange of medical services for payment and the AOB is adequate consideration, we do not address Patients' alternative consideration arguments.

C.

Third, the district court accurately found that Patients failed to plausibly allege that the AOB should be rescinded based on lack of mental capacity. An individual has mental capacity to contract if he "understands the nature of the act in which he is engaged and its scope and effect, or its nature and consequences." *Ludwig v. Hart*, 252 S.E.2d 270, 273 (N.C. Ct. App. 1979) (cleaned up). Patients allege that Bertolo had "foggy memory"; Elrod "was terrified and in a panicked state"; and Janine Palmer "was in a state of complete panic," J.A. 118–19, 121, but these allegations alone are insufficient to plausibly plead that Patients did not understand the nature of the GCF and its effects. *See Ludwig*, 252 S.E.2d at 273. And although Patients also allege that if they had read the GCF, "it is doubtful they would have understood the significance of the legal terms" under the circumstances, J.A. 125, this assertion is a "conclusory allegation of an element of" diminished capacity and is also impermissibly speculative. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 259 (4th Cir. 2009); *see Lokhova v. Halper*, 995 F.3d 134, 148 (4th Cir. 2021) ("[S]peculative conclusions are insufficient to survive a motion to dismiss."). Therefore, we find that the district court properly rejected Patients' lack-of-capacity argument.

D.

Fourth, the district court correctly rejected Patients' unconscionability argument. To succeed on such an argument, Patients must allege both procedural and substantive unconscionability. *Tillman v. Com. Credit Loans, Inc.*, 655 S.E.2d 362, 370 (N.C. 2008). Here, Patients have failed to plausibly plead substantive unconscionability, so we do not analyze procedural unconscionability.

14

Substantive unconscionability "refers to harsh, one-sided, and oppressive contract terms." *Id.* Patients failed to plausibly allege that the AOB is harsh, one-sided, or oppressive where it indicates that WakeMed will provide healthcare services in exchange for Patients' insurers paying benefits directly to WakeMed for those services. *See Charlotte-Mecklenburg Hosp. Auth. v. First of Ga. Ins. Co.*, 455 S.E.2d 655, 657 (N.C. 1995) (finding, based on an AOB, that insurers were required to pay a hospital directly for the amount owed to the hospital due to services rendered to the patient); *Barnard v. Johnston Health Servs. Corp.*, 839 S.E.2d 869, 870–71 (N.C. Ct. App. 2020) (finding that the following provision applied to the plaintiff's medpay benefits: "I authorize [the hospital] to bill directly and assign the right to all health and liability insurance benefits otherwise payable to me, and I authorize direct payment to [the hospital]." (emphasis deleted)); *Alaimo Fam. Chiropractic v. Allstate Ins. Co.*, 574 S.E.2d 496, 498–99 (N.C. Ct. App. 2002) (finding a clear assignment where the provision directed the insurer to pay benefits to the healthcare provider for charges incurred by the patient).[13] Therefore, we

---

[13] Patients argue that the district court erred in relying on *Charlotte-Mecklenburg* and *Alaimo* because those cases did not involve contracts executed during a medical emergency. But, as the district court said, "[t]his distinction . . . is beside the point on the issue of substantive unconscionability, which considers the terms of the assignments rather than the circumstances of their execution." *Elrod*, 561 F. Supp. 3d at 612. Patients also assert that this Court should "overrule[]" *Barnard*, Opening Br. 28, but a federal court cannot "overrule" a state-court decision on state law, nor have Patients identified any persuasive basis on which this Court can disregard the Court of Appeals of North Carolina's decision, *see Knibbs v. Momphard*, 30 F.4th 200, 232 (4th Cir. 2022) (explaining that federal courts can only disregard intermediate state-court decisions if they are "convinced by other persuasive data" that the state supreme court would reject those decisions).

15

agree with the district court that Patients failed to plausibly allege that the AOB is unconscionable.

E.

Fifth, we agree with the district court that Patients failed to plausibly allege that the GCF should be rescinded based on duress or undue influence. "Duress exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will." *Radford v. Keith*, 584 S.E.2d 815, 817 (N.C. Ct. App. 2003) (citation omitted). "The act threatened is wrongful if made with the corrupt intent to coerce a transaction grossly unfair to the victim." *Id.* (cleaned up).

Patients do not plausibly allege that WakeMed engaged in unlawful acts. *See, e.g.*, J.A. 118 (alleging that Bertolo was "directed" to sign the contract); J.A. 119 (alleging that Elrod was "presented" with the GCF). Further, as explained regarding unconscionability, they have not plausibly alleged that the GCF is "grossly unfair." *Radford*, 584 S.E.2d at 817. Thus, their duress claim fails.

Similarly, undue influence requires, *inter alia*, "a result indicating undue influence." *Clark v. Foust-Graham*, 615 S.E.2d 398, 402 (N.C. Ct. App. 2005). For the same reasons that Patients' duress claim fails, Patients do not plausibly allege a result indicating undue influence. Therefore, Patients failed to plead a claim for rescission based on undue influence.

16

F.

Sixth, the district court did not err in concluding that Patients failed to plausibly allege fraud. Rescinding a contract based on fraud requires a "(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *RD & J Props. v. Lauralea-Dilton Enters.*, 600 S.E.2d 492, 498 (N.C. Ct. App. 2004) (cleaned up). Moreover, the "plaintiff's reliance on any misrepresentations must be reasonable." *Id.*

Patients claim that WakeMed concealed that they "were signing away their rights to their Med Pay," J.A. 124, but do not plausibly allege that WakeMed intended to deceive them. In addition, Patients have not alleged that they reasonably relied on this concealment in signing the GCF. Rather, Bertolo and Elrod alleged that if they had known of the AOB, "they would not have known what to do," J.A. 124, and Janine Palmer said that "she would have signed anything she was directed to sign," J.A. 124–25. Further, Patients failed to meet the heightened Rule 9(b) pleading standard that applies to fraud claims because they failed to plead the identity of the individuals who concealed information from them. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (explaining that Rule 9(b) requires "the identity of the person making the misrepresentation" to be pleaded with particularity (citation omitted)).

In sum, we agree with the district court that Patients failed to plausibly allege that the GCF and AOB lacked consideration, the parties lacked mutual assent, or that the GCF and AOB should be rescinded.

17

IV.

Finally, we turn to Patients' argument that the AOB is unenforceable under the law governing Medicare.[14] Under 42 U.S.C. § 1395y(b)(2)(A)(ii), Medicare cannot pay for services if "payment has been made or can reasonably be expected to be made under . . . an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance." This statutory provision makes Medicare "an entitlement of last resort, available only if no private [party] [is] liable." *Netro v. Greater Balt. Med. Ctr., Inc.*, 891 F.3d 522, 524 (4th Cir. 2018) (first alteration in original) (quoting *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1234 (11th Cir. 2016)). Section 1395y's implementing regulations provide that Medicare providers must "bill other primary payers before Medicare" and must "maintain a system that, during the admission process, identifies any primary payers other than Medicare, so that incorrect billing and Medicare overpayments can be prevented." 42 C.F.R. § 489.20(f), (g). The AOB promotes this system by making it easier for WakeMed to seek payment directly from primary payers such that "Medicare overpayments can be prevented." *Id.* § 489.20(f).

Patients rely on § 1395a to argue that the GCF was subject to certain restrictions with which WakeMed did not comply, but that statute has no relevance to the allegations in the amended complaint. Section 1395a allows a physician or practitioner to enter a

---

[14] It is unclear how this argument is relevant considering that Patients are adamant that they do not bring a claim for a violation of any provisions governing Medicare. Nevertheless, we address it.

private contract with a Medicare beneficiary for any service for which no Medicare claim will be submitted and for which the physician will not receive Medicare reimbursement. 42 U.S.C. § 1395a(b)(1). Such a contract must be in a writing signed by the beneficiary; must contain certain terms; and cannot be entered into during an emergency health situation. *Id.* § 1395a(b)(2). Further, an affidavit signed by the physician must be in effect during the contractual period. *Id.* § 1395a(b)(3). A physician who enters such a contract "is barred from submitting a claim to Medicare on behalf of any patient for a two-year period." *United Seniors Ass'n, Inc. v. Shalala*, 182 F.3d 965, 968 (D.C. Cir. 1999).

The GCF is not a private contract to which § 1395a applies, and Patients' argument that WakeMed violated this provision thus fails. First, the GCF was not entered into by a patient and a physician or practitioner—it is between a patient and WakeMed. *See id.* at 968 (explaining that § 1395a(b) "permits *doctors and patients* to contract" (emphasis added)). Second, the GCF does not contain the requisite statutory language.[15] *See* 42 U.S.C. § 1395a(b)(2)(A)(ii), (B). Third, the GCF does not reference the required affidavit, and Patients have not contended that such an affidavit exists. *See id.* § 1395a(b)(3). Therefore, WakeMed did not violate § 1395a by entering the AOB with Patients. Instead, WakeMed

---

[15] Patients argue that the fact that the GCF does not include the necessary language "would result in [the] absurd conclusion" that "all that a physician has [to] do to circumvent the protection of the [private-contract provision] is to exclude the required language." Reply Br. 21. But this argument is off base. If the necessary language is not included and the requisite affidavit is not signed by the physician, then § 1395a(b)(1) simply does not apply. *See* 42 U.S.C. § 1395a(b)(2)(A), (b)(3).

19

engaged in conduct "that furthers the central purposes of the Medicare Secondary Payer Act." *Elrod*, 561 F. Supp. 3d at 609.

V.

For the foregoing reasons, we affirm the district court's dismissal of the amended complaint.

*AFFIRMED*