[Cite as *Rupp v. Premier Health Partners*, 2025-Ohio-985.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| CHRISTOPHER REID RUPP, ET AL. | : | |
| | : | |
| Appellees | : | C.A. No. 30146 |
| | : | |
| v. | : | Trial Court Case No. 2018 CV 01916 |
| | : | |
| | : | (Civil Appeal from Common Pleas |
| PREMIER HEALTH PARTNERS, ET AL. | : | Court) |
| | : | |
| Appellees | : | |
| | | |
| KENNETH D. CHRISTMAN, M.D. | | |
| Appellant | | |
| v. | | |
| CHRISTOPHER REID RUPP, ET AL. | | |
| Appellees | | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 21, 2025

. . . . . . . . . . .

TERRY W. POSEY, JR. & ANTHONY V. GRABER, Attorneys for Appellant Kenneth D. Christman, M.D.

ADAM V. SADLOWSKI, KELLY MULLOY MYERS & PAIGE E. RICHARDSON, Attorneys for Appellee Christopher Reid Rupp

. . . . . . . . . . . . .

HANSEMAN, J.

{¶ 1} Appellant, Kenneth Christman, M.D., d/b/a Christman Plastic Surgery ("Christman"), appeals from a directed verdict granted in favor of Appellees, Christopher Reid Rupp, Ed Garrett, and Kristin Garrett (collectively "Patients"). In support of his appeal, Christman contends the trial court erred in various ways, including granting a directed verdict, denying Christman's motion for summary judgment on his counterclaims, admitting expert testimony from Patients' billing expert, failing to bifurcate the trials, allowing Patients to assert waived defenses, letting Patients amend their answer during trial, and in limiting attorney fees and costs under the counterclaims to amounts attributable to prosecuting those claims rather than fees incurred in defending against Patients' claims.

{¶ 2} After reviewing the record, we conclude that the trial court erred in granting a directed verdict in favor of Patients on Christman's counterclaim for breach of contract. While the court found the contract unconscionable, there were genuine issues of fact concerning whether it was substantively unconscionable. However, the court did not err in rejecting Christman's claim for unjust enrichment. This doctrine does not apply where the parties have entered into an express contract.

{¶ 3} We further conclude that the trial court did not abuse its discretion in allowing the testimony of Patients' billing expert, as the expert's data was reliable. The court also did not abuse its discretion by refusing to bifurcate the trial, because the most relevant

facts were common to the two patients' cases, and separate trials would have significantly increased expenses for all parties. Christman's claim of prejudice was also exaggerated. Further, Patients did not waive any defenses, and the court did not err in allowing them to amend their answer during trial. Christman was well aware of the parties' positions in this protracted litigation, and he failed to object at trial to amendment of the answer or to the defenses raised.

{¶ 4} As an additional matter, the trial court did not err in denying Christman's motion for summary judgment on his counterclaims, as there were genuine issues of material fact as to the validity of the contracts. Finally, objections to the trial court's limitation of Christman's attorney fee request to expenses associated with his counterclaim are premature because this matter is being remanded for a new trial. More importantly, the court bifurcated the attorney fee claim, and no trial was ever held on that point. Accordingly, the judgment of the trial court will be reversed, and this cause will be remanded for further proceedings.

I. Facts and Course of Proceedings

{¶ 5} This appeal and another pending appeal (*Rupp v. Premier Health Partners*, Montgomery C.A. No. 30154) arise from the same set of facts. In May 2018, Patients filed a class action complaint against Premier Health Partners ("Premier") and Dr. Christman, alleging violations of the Ohio Consumer Sales Practices Act ("CSPA"), violations of the Ohio Corrupt Practices Act, common law fraud, negligent misrepresentation and concealment, civil conspiracy, and unjust enrichment. All the

claims (other than the CSPA claim) were individual and class claims against both Premier and Christman; the CSPA claim was brought individually only against Premier.

{¶ 6} According to the complaint, Christopher Reid Rupp ("Reid") was injured in a bicycle accident in December 2016 and was transported from a hospital in Oxford, Ohio, to Miami Valley Hospital ("MVH") in Dayton, Ohio. Reid's family (the Rupps") chose MVH because it was near the Rupp family residence, accepted their insurance, and was an in-network provider. At that time, Christman was an on-call surgeon, and neither MVH nor Christman told Reid or his family that Christman did not accept any insurance, was not in-network, and engaged in "balance billing practices."

{¶ 7} Reid's insurer paid for all hospital costs, which exceeded $70,000, except for $19,108 of Christman's bill. This was because Christman did not accept insurance and was considered out of network. The complaint further alleged that Christman inflated his charges for medical services by a factor of 10, and that Reid's insurance carrier eventually sent Reid a check for $1,823.56 as the amount allowed for an in-network provider at MVH for the surgery. Christman accepted the check from Reid but then sent the Rupps a new invoice for more than $17,000. When they failed to pay, Christman threatened them with "protracted and unpleasant collection efforts" and later placed the account with a third-party debt collector, which began collection activities and reported the debt to credit agencies.

{¶ 8} Similarly, the Garretts' son was injured in an auto accident in October 2016 and was transported to MVH, which was within their insurance network. MVH presented Christman as the doctor who would perform surgery, and again, the Garretts were not

told that Christman did not accept insurance, was not in network, and engaged in balance billing. The complaint alleged that while the Garretts' insurer paid for all other bills and did pay Christman over $13,000 for his services, Christman billed the Garretts $9,458.50 in excess of what a physician who accepted insurance payment as payment in full would have charged. Christman threatened the Garretts when they did not pay the excess amount.

{¶ 9} The complaint further alleged that Premier and Christman had knowingly and willfully entered into a scheme that let Christman perpetuate his billing scheme on Patients and other putative class members, and that Christman, with Premier's knowledge and approval, failed to disclose to his patients that he does not accept insurance, that he is not "in-network," and that he engages in balance billing practices until his office sends a bill, which is often weeks or months after he has performed medical services. Patients also alleged that both Premier and Christman had received numerous complaints and grievances over the years about their illegal and unethical conduct but had continued the scheme because they gained financially by continuing to generate increased medical fees.

{¶ 10} The complaint also set forth class allegations, outlined the claims for relief, and requested various relief including class certification, damages (both compensatory and punitive), attorney fees, pre- and post-judgment interest, and other relief.

{¶ 11} In July 2018, Premier responded by filing a motion to dismiss the complaint pursuant to Civ.R. 12(B)(6). Patients then received permission to file an amended complaint and did so in August 2018. The amended complaint included an additional

individual and class claim against Premier for negligent credentialing as well as an intended third-party beneficiary contract claim against Christman. Subsequently, both Premier and Christman filed motions to dismiss that complaint, and Patients responded. In February 2019, the court granted Premier's motion to dismiss with respect to negligent credentialing but denied the rest of the motions to dismiss. Decision and Entry Denying in Part and Granting in Part Motions to Dismiss Complaint (Feb. 4, 2019), p. 2.

{¶ 12} After the court's decision, both Premier and Christman filed answers to the amended complaint, and Christman included a counterclaim against Patients for the amounts alleged to be owed for his medical services. Shortly thereafter, Christman filed an amended answer and counterclaim. Premier then received permission to file an amended answer and did so in July 2019, adding additional affirmative defenses. Also in July 2019, Patients sought leave to amend the complaint again in order to remove the negligent credentialing claim and to assert new fraud allegations. The court granted this motion in early February 2020; Patients then filed a second amended complaint on February 7, 2020. Both defendants again filed answers.

{¶ 13} In July 2020, Premier and Christman filed a joint motion asking the court to order that motions for summary judgment and class certification be filed under seal, and the court granted the motion. Premier then filed its summary judgment motion on August 14, 2020; the same day, Patients filed a motion for class certification. Patients responded to the summary judgment motion on September 28, 2020, and that day, Premier and Christman replied to the class certification motion. In October, Christman also filed summary judgment motions on the claims against him and in support of his

counterclaims.

{¶ 14} By April 2021, the parties had filed all responsive memoranda relating to both the summary judgment motions and class certification, and the court had also held a class certification hearing. In June 2021, the court denied the class certification motion and, in July 2021, it granted all the defense motions for summary judgment other than Christman's summary judgment motion on his counterclaims. Patients appealed from the summary judgment decision but did not appeal from denial of class certification.

{¶ 15} The appeal was dismissed at Patients' request in September 2021. *See* Montgomery C.A. No. 29216 (Sept. 8, 2021). After that, the trial court filed a decision granting Christman's summary judgment motion in part and denying it in part. In this regard, the court stated:

> The Court finds there are genuine issues of material fact regarding Dr. Christman's claim that plaintiffs owe him compensation for medical services for breach of their contract to compensate him for the amount asserted to be due after payment by their insurer. The Court rejects Dr. Christman's argument that he still has a claim for unjust enrichment or quantum meruit, despite seeking recovery for breach of contract, as held in *Christman v. Day*, [Montgomery C.P. No. 2017 CV 3365 (Sept. 10, 2021)] *supra*. Also, the Court finds there are genuine issues of material fact regarding whether the relationship of physician and patient may have required a duty to disclose to the patient how the physician will be compensated for services. Such a duty could impact the extent to which the patient is obligated to pay

more than what insurance pays for the services.

Accordingly, Dr. Christman's motion for summary judgment in his favor with respect to his counterclaims for money alleged to be owed for services rendered, is GRANTED IN PART regarding plaintiffs' arguments that "balance billing" was unlawful precluding his counterclaims and DENIED IN PART, leaving the finder of the facts to decide genuine issues of fact regarding the alleged breach of contract by plaintiffs and whether the failure to disclose so violated the special physician and patient relationship, that it may impact the obligation of the patients to pay more than the amount paid by health insurers.

Decision and Entry Granting in Part, and Denying in Part, Defendant Christman's Motion for Summary Judgment on Counterclaims (Jan. 8, 2022), p. 3-4.

{¶ 16} Christman filed a motion for reconsideration, but the court denied his motion in March 2022 and set an August 2022 trial on the counterclaims. In August, the court denied Christman's motion to bifurcate the Patients' trials but granted his motion for a separate trial on attorney fees and costs he was claiming. *See* Decision and Entry on Motions to Bifurcate and Quash Subpoenas (Aug. 17, 2022), p. 1.

{¶ 17} Thereafter, the trial was continued, and Christman asked the court for permission to file an amended counterclaim adding an additional defendant, but this was denied in June 2023. Ultimately, trial was set for April 1, 2024. After Christman asked for clarification of the issues for trial, the court filed the following decision:

The Court has reviewed the procedural posture of this matter set for

a jury trial on April 1, 2024. This Court found there were genuine issues of material fact remaining with regard to Christman's counterclaim. The Court advises the parties that if the jury finds Rupp and/or Garretts liable to Christman, the amount of damages would be limited to the unpaid balance billed to them and collection fees or attorney fees related directly to the counterclaim Christman filed and not the defense of the claims made by Rupps and Garretts against him and others in this case.

Entry Clarifying Issue for Trial (Mar. 31, 2024), p. 1.

{¶ 18} The trial occurred on April 1, 2024, as scheduled. After Christman (who had been realigned as a plaintiff) concluded his case, the court granted the Patients' motion for a directed verdict. Subsequently, the court filed a decision reflecting its reasoning. *See* Decision and Entry Granting Motion for Directed Verdict; Final Judgment (Apr. 26, 2024). On May 14, 2024, Christman appealed from the court's decision, and the appeal was docketed as Montgomery C.A. No. 30146 (the current appeal). On May 22, 2024, Patients appealed from the court's July 31, 2021 summary judgment decision, and that appeal was docketed as Montgomery C.A. No. 30154. In late August 2024, we issued an order transferring the summary of docket and journal entries and all original papers from the prior appeals (Case Nos. 29016 and 30146) to Case No. 31054. *See* Amended Order Sustaining Motion to Correct the Record (Aug. 28, 2024), Case No. 30154. However, we did not consolidate the appeals, and this opinion deals only with Christman's counterclaims against Patients.

{¶ 19} With this background in mind, we will consider Christman's assignments of

error.

## II.  Propriety of Granting a Directed Verdict

{¶ 20} Christman's first assignment of error states that:

The Trial Court Erred in Granting a Directed Verdict Dismissing Dr. Christman's Counterclaims.

{¶ 21} Under this assignment of error, Christman claims that the directed verdict motion was procedurally invalid because Patients did not make the motion at the end of his case, but then made the motion in the middle of their case.   Christman further argues that the trial court improperly deemed the contracts unconscionable and contracts of adhesion even though Patients did not argue this and did not assert it as an affirmative defense in their pleadings.   Finally, Christman argues the court's decision was flawed because the contracts were neither unconscionable nor adhesive, and their terms did not meet the standards for substantive unconscionability.   Before addressing these arguments, we will briefly outline relevant standards that apply to directed verdicts.

## A.  Directed Verdict Standards

{¶ 22} "According to Civ.R. 50(A)(4), a motion for directed verdict is granted if, after construing the evidence most strongly in favor of the party against whom the motion is directed, 'reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.' "   *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 2002-Ohio-2492, ¶ 3.   "The 'reasonable minds' test mandated

by Civ.R. 50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." *Id.*, citing Civ.R. 50(A)(4) and *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 69 (1982). "When a motion for a directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to the jury. This does not involve weighing the evidence or trying the credibility of witnesses; it is in the nature of a demurrer to the evidence and assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence. The evidence is granted its most favorable interpretation and is considered as establishing every material fact it tends to prove." *Ruta* at 68-69.

{¶ 23} We apply de novo review to decisions granting or denying directed verdicts. *Rieger v. Giant Eagle, Inc.*, 2019-Ohio-3745, ¶ 8, citing *White v. Leimbach*, 2011-Ohio-6238, ¶ 22. In this type of review, we use the same standards as the trial court. *Coldly v. Fuyao Glass Am., Inc.*, 2022-Ohio-1960, ¶ 9 (2d Dist.). We also "independently review trial court decisions and accord them no deference." *Id.*, citing *Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192 (8th Dist.1997). With these standards in mind, we will consider Christman's arguments.

## B. Timing of the Motion

{¶ 24} As noted, Christman argues that the directed verdict motion was improper because it was not made when he rested, but was made in the middle of Patients' case.

Under Civ.R. 50(A)(1), "A motion for a directed verdict may be made on the opening statement of the opponent, at the close of the opponent's evidence or at the close of all the evidence."

{¶ 25} From the beginning of trial here, the parties clearly understood (and told the court) that they would be calling witnesses out of order to avoid repetition. For example, Christman (who had been realigned as the plaintiff), would call the Patients during his own case on cross-examination, and then the Patients' attorney would conduct direct examination of them at that time rather than waiting until Patients presented their own case. Trial Transcript (Tr.), 110-113. The court also informed the jury of the difference in the normal procedure. *Id.* at 446. Furthermore, when Christman rested, Patients' counsel stated that he was contemplating seeking a directed verdict. At that time, the court said: "What we'll do is we'll take this witness then before we do lunch, any motions you wish to make – . . . After the exhibits are admitted, okay?" *Id.* at 587. Christman's counsel agreed to this. *Id.* After the next witness testified, the court admitted the exhibits and confirmed with Christman's counsel that he was totally resting at that time. *Id.* at 647. At that point, Patients' counsel moved for a directed verdict. *Id.* There was nothing improper about this procedure.

## C. Failure to Assert Defenses

{¶ 26} Christman's next argument is that Patients failed to raise unconscionability or contracts of adhesion as defenses. However, Christman did not object on this basis at trial. *See* Tr. at 648-649. Generally, "[a]n appellate court will not consider any error

which a party complaining of a trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 123 (1987), citing *Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41 (1975).

**{¶ 27}** By the time of trial, this case had been pending for nearly six years, and the parties had engaged in extensive discovery. In addition, Patients had alleged since the time their answer to the counterclaims was filed in 2019 that the contract was invalid and unenforceable due to Christman's purported fraudulent conduct, and that Christman's claims were barred because of unclean hands, undue influence, and duress. *See* Patients' Answer to Counterclaims (Apr. 24, 2019), p. 4-5. They also raised fraud claims in their complaint. *See* Second Amended Complaint (Feb. 7, 2020), p. 27-28. Consequently, there is no credible claim that Christman was somehow surprised by the assertion that his contracts were unconscionable. In addition, as Christman failed to object at trial, he has waived this argument.

**{¶ 28}** Where parties fail to object, an exception exists for plain error, but this "doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus. Having reviewed the entire record, we find no plain error in the court's decision to allow Patients to assert unconscionability. However, the issue remains whether the court was correct in granting a direct verdict on

this basis.

## D. Unconscionability

**{¶ 29}** Christman's third point is that the trial court's directed verdict decision was substantively flawed because Patients failed to show the agreements were contracts of adhesion or were unconscionable. In this regard, Christman points to the following facts: (1) his agreements with MVH let him balance bill patients; (2) he based his bills on American Medical Association ("AMA") principles; (3) he avoids contractual arrangements with insurers because AMA principles discourage such contracts; (4) Patients signed the contracts; (5) his fees were within the region's usual, customary, and reasonable ("UCR") charges; and (6) Patients agreed to pay charges not covered by insurance, including interest and collection fees. Christman Brief, p. 17-18.

**{¶ 30}** In granting the directed verdict, the court stated at trial that:

THE COURT: So the Court, of course, has been aware of these exhibits [the contracts with Patients] prior to the start of the trial. I've read the exhibits. I've read the law 1302.15. It's essentially an adoption of the UCC Code. We all know that's what Title 13 does and it talks about unconscionate [sic] billing and it says, and I'll quote, "If the Court as a matter of law finds that the contract or any clause of the contract to have been unconscionable at the time it was made", and this Court's opinion that at the time it was made is a factor. By that, here's what I mean.

This Court strives to the best this Court can to do the best it can do

to be fair in all cases to all parties, but it has seemed to me that the presentation of this contract on the very day that treatment is to be rendered, and in fact includes responsibilities for services that were done prior to the day that the execution of this contract was had. So I have considered the law. There's a case, *Newland v. AEC S. Ohio* out of the Fifth Appellate District, Plaintiff 15CA00145 (indiscernible) analysis and also *Kaiser v. Goff* decided at 2022, Appeal No. C-220097.

And I've considered the evidence that I have heard and I, as a matter of law, find that this is an unconscionable contract, an adhesion contract, and accordingly, I sustain your motion at this time.

Tr. at 650-651.

**{¶ 31}** The court subsequently filed a written decision stating as follows:

Christman's claim is based on a document his office required that Rupp and Garretts sign to secure further medical services following the emergency treatment and also informing them that no other physician would agree to provide that treatment. The document is coercive on its face and threatens the patients with liability for collection fees and attorney fees incurred if they fail to pay his unilaterally determined claim for amounts not paid for by insurance.

The undisputed evidence is that both Rupp, his mother, and the Garretts had no ability to bargain or negotiate the terms in Christman's standard document, prepared by and presented to them by Christman at

his private office when there was a clear necessity of obtaining further medical care from the surgeon who performed the emergency surgery on Rupp and Nicholas Garrett, the minor son of Ed and Kristen Garrett. The circumstances were such that they had no choice but to accept the terms mandated by Christman who drafted the document that forced them to accept his balance billing to collect amounts in excess of what insurers had paid him and above usual and customary rates.

The Court finds that Christman's document upon which he bases his breach of contract claim is substantively and procedurally unconscionable and a contract of adhesion. Christman had sufficient time to disclose his intentions prior to performing the emergency medical treatment and failed to do so. Rupps and Garretts were forced into facing the one-sided terms with no bargaining power and under the stressful situation of needed follow up care for very serious medical conditions despite being threatened with additional costs and a stipulation to pay attorney fees as a penalty for nonpayment as demanded by Christman. Construing the evidence most strongly in favor of Christman and against Rupps and Garretts, the Court finds that upon the determinative issue, reasonable minds could come to one conclusion upon the evidence submitted and that conclusion is adverse to Christman with regard to the unenforceability of Christman's contract claim.

Decision and Entry Granting Motion for Directed Verdict; Final Judgment (Apr. 26, 2024),

p. 1-2.

{¶ 32} "Unconscionability is a ground for revocation of a contract." *Taylor Bldg. Corp. of Am. v. Benfield*, 2008-Ohio-938, ¶ 32. It "includes both ' "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." ' " *Id.* at ¶ 33, quoting *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 383 (1993). (Other citation omitted.) In addition, "[t]he party asserting unconscionability of a contract bears the burden of proving that the agreement is both procedurally and substantively unconscionable." *Id.*

{¶ 33} "Substantive unconscionability involves those factors which relate to the contract terms themselves and whether they are commercially reasonable. Because the determination of commercial reasonableness varies with the content of the contract terms at issue in any given case, no generally accepted list of factors has been developed for this category of unconscionability. However, courts examining whether a particular limitations clause is substantively unconscionable have considered the following factors: the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability." *Collins v. Click Camera & Video, Inc.*, 86 Ohio App.3d 826, 834 (2d Dist.1993), citing *Fotomat Corp. of Florida v. Chanda*, 464 So.2d 626 (Fla.App.1985), and *Richard A. Berjian, D. O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147, 150 (1978). "However, the Supreme Court of Ohio has not adopted a 'bright line set of factors'; instead, '[t]he factors to be considered vary with the content of the agreement at issue.' " *Rudolph v. Wright Patt Credit Union*, 2021-Ohio-2215, ¶ 78 (2d Dist.), quoting *Hayes v. Oakridge Home*, 2009-Ohio-2054, ¶ 33.

**{¶ 34}** "Procedural unconscionability involves those factors bearing on the relative bargaining position of the contracting parties, *e.g.*, 'age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the [services] in question.' " *Collins* at 834, quoting *Johnson v. Mobil Oil Corp.*, 415 F.Supp. 264, 268 (E.D. Mich. 1976). "The issue of procedural unconscionability in particular is fact-specific because it concerns the circumstances surrounding the making of the agreement." *Moran v. Riverfront Diversified, Inc.*, 2011-Ohio-6328, ¶ 32 (2d Dist.).

**{¶ 35}** As noted, the trial court also described Christman's contracts as ones of adhesion. A contract of adhesion is "a standardized form contract prepared by one party, and offered to the weaker party, usually a consumer, who has no realistic choice as to the contract terms." *Taylor,* 2008-Ohio-938, at ¶ 48, citing *Black's Law Dictionary* (8th Ed.2004). Such contracts can be "unconscionable per se," but "not in all instances." *Id.* at ¶ 49. *See also Moran* at ¶ 23.

(E) Relevant Facts

**{¶ 36}** The facts pertinent to this issue, construed in Christman's favor, are as follows. Dr. Christman is a board-certified plastic surgeon and has been practicing since 1981. He performs cosmetic procedures as well as hand surgery and reconstructive

surgeries, especially maxillofacial ("max face") surgery for various types of procedures, trauma, and accidents.   Tr. at 137-138.

{¶ 37} At one time, Christman had contracts with insurers, but since 2001, he has not contracted with any private insurer.   He did contract with Medicare, which is not a private insurer.   *Id.* at 196.   Until 2024, Christman had medical privileges at MVH and he also previously had contracts with MVH to provide on-call services in both plastic surgery ("plastics") and max face.   *Id.* at 193-194.   As compensation for being on call, MVH paid Christman a stipend for each day he was on call, whether or not he was called and performed services.   If Christman did treat patients, he was also allowed to bill a patient's insurer for his services.   MVH terminated Christman's on-call contracts in 2009 and reinstated him in 2010; it also terminated Christman's on-call contracts around 2022, and Christman was not under contract at the time of trial in April 2024.   *Id.* at 193-196 and 207-208.

{¶ 38} Between 2007 and September 2012, Diane Pleiman was Vice President of Operations at MVH and was responsible for the Emergency Trauma Center, CareFlight, medical imaging, lab, and other departments.   In this position, she had a supervisory role over on-call contracts, including those of Christman.   In 2007 and 2008, Christman had a contract with MVH for max face and for plastics.   However, in that time frame, Pleiman became aware of patient complaints and complaints by the Bureau of Workers' Compensation ("BWC") about Christman's billing practices.   In addition, MVH executives also communicated concerns to Christman during this time about the fact that, in their opinion, he was charging excessive fees.   MVH was also concerned about Christman's

failure to disclose his billing practices. MVH had meetings with Christman about these issues and also communicated them to him in writing. *Id.* at 202-204, 589-595, 600, 602-603, 604, and 641-642.

**{¶ 39}** In December 2008, Dr. Pacenta, the MVH chief of staff, sent a letter to Christman raising concerns about the complaints and about Christman's billing practices. The letter stated that:

> I have been notified of an ongoing issue relative to on-call physicians being nonparticipants in medical plans and balance billing patients. This has been particularly devastating for patients whose physicians do not accept workers' compensation coverage. Most recently, a workers' compensation patient was billed for $9,000 more than the $3,200 allowed by the plan to compensate for complex wound closure. Patients who arrive in our emergency department in an emergency situation typically do not have a ready choice as to who their specialty physician provider will be and are surprised and understandably upset when faced with an unexpected large physician bill.

Tr. at 205 and Ex. 1.

**{¶ 40}** Pacenta's letter further stated that: "I am writing to request that you discontinue this practice in the Miami Valley Hospital Emergency Department. Failure to stop this practice will result in your being removed from the call schedule at Miami Valley Hospital. Should you be under contract at Miami Valley Hospital, termination will be processed in accordance with the terms of the contract." *Id.* at 206 and Ex. 1. After

Pacenta sent this letter, MVH received additional complaints, one of which was from the BWC in late February 2009. However, Christman stood by his position that as an independent physician, he could set his billing practices. *Id.* at 600-602 and Ex. A.

**{¶ 41}** While Christman did accept payments from insurers, he engaged in a practice called "balance billing," which "occurs when a provider of medical supplies or services charges or collects, from a beneficiary of a government or private health insurance plan, or from some other payor, an amount in excess of the amount that is reimbursable under the applicable health insurance plan. In practice, this occurs when a provider of medical supplies or services accepts partial payment from a private or government insurance plan, then bills the patient or other entity for the difference between that reimbursement and the provider's usual, customary, or standard charge." *Propriety and Use of Balance Billing in Health Care Context*, 69 A.L.R.6th 317, § 1, fn.1 (2011).

**{¶ 42}** Medicare prohibits "balance billing patients of providers who have entered provider agreements to provide services to Medicare recipients, generally requiring medical providers to agree to accept Medicare payments as payment in full for their services." *Id.* at § 2, citing 42 U.S.C. 1395cc(a)(1)(A) and 42 C.F.R. 489.21(a). Individual states, including Ohio, have enacted similar laws. *E.g.*, R.C. 4769.02. Some states have also banned or regulated balance billing. *See* CA HLTH & S 1371.9. Ohio has not done so.

**{¶ 43}** However, in 2020, Congress passed the "No Surprises Act" ("NSA") "to protect patients from surprise medical bills in situations where they have no choice over whether their provider is in-network." *Texas Med. Assn. v. United States Dept. of Health*

*& Human Servs.*, 120 F.4th 494, 501 (5th Cir. 2024), citing Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 2758-890 (2020). "The NSA prohibits out-of-network health care providers from billing health plan members directly for certain items or services. *See* 42 U.S.C. §§ 300gg-131(a) (emergency services); 300gg-132 (non-emergency services). A provider must instead seek compensation from the patient's health care plan. Under the act, upon receiving a request for payment from a provider, the patient's health care plan determines whether and in what amount it will pay for the services. If the provider and health care plan cannot agree on an amount, the act provides for an independent dispute resolution ('IDR') process in which a private arbitrator ('IDR entity') selects between amounts submitted by the provider and the health plan." *Neurological Surgery Practice of Long Island, PLLC v. United States Dept. of Health & Human Servs.*, 682 F.Supp.3d 249, 255 (E.D. N.Y. 2023).

**{¶ 44}** Under the NSA, a " 'nonparticipating provider' means, with respect to an item or service and a group health plan or group or individual health insurance coverage offered by a health insurance issuer, a physician or other health care provider who is acting within the scope of practice of that provider's license or certification under applicable State law and who does not have a contractual relationship with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively." 42 U.S.C. 300gg-111(a)(3)(G)(i). Thus, after NSA became effective, balance billing was prohibited in emergency situations. The law also requires health care providers and health care facilities to make various disclosures about balance billing prohibitions. *See* 42 U.S.C. 300gg-133.

{¶ 45} Following Dr. Pacenta's warning to Christman about balance billing, Pleiman attended a meeting with Christman, Dr. Collier (MVH chief medical officer), Bobbie Gerhardt (Pleiman's supervisor and MVH COO), and Mary Boosalis, the MVH CEO.   During the meeting, MVH personnel explained their concerns about the financial impact Christman's billing practices would have on patients and stated that, based on complaints MVH was receiving, Christman's billing practices were having "some pretty devastating impact from a financial perspective on the patients because he was not accepting what the insurance was paying."   Tr. at 603.

{¶ 46} In the meeting, however, it was clear that Christman was not going to change his billing practices.   As a result, MVH needed to make a decision about whether to retain him on the call schedules.   After internal meetings and discussions with her supervisor, Pleiman decided to terminate Christman's on-call contracts.   *Id.* at 605-607. MVH's legal counsel sent Christman a letter on May 7, 2009, informing him that MVH was terminating his on-call contracts for max face and plastics.   *Id.* at 608-609 and Ex. 4.

{¶ 47} In addition, Pleiman sent Christman a letter the same day, telling him that he would no longer be on the call schedule for plastics and max face.   In the letter, Pleiman also stated that: "As you may recall, Dr. Pacenta, Chief of Staff, corresponded with you on December 29th, 2008 regarding the significant issues arising from your billing practices.   As he indicated, your choice of billing practice causes devastating financial problems for patients of the hospital.   Furthermore, the hospital has received at least one written complaint from a governmental agency regarding your billing practices. The hospital has also received several more patient complaints since Dr. Pacenta's letter as

to your billing practices and the charges relative to your bills. For these reasons, it is believed that it is in the best interest of patients in the community and the hospital to no longer include you on the call schedule." *Id.* at 208-209 and 609-610, and Ex. 3.

**{¶ 48}** In response, Christman wrote to Boosalis, stating that he was "shocked and bewildered" by the letters terminating his contracts, and asked for reinstatement. Tr. at 209-210 and 612-613, and Ex. 5. Christman also wrote to MVH's chief legal counsel, Dale Creech, on May 27, 2009. In this letter, Christman said: "Miami Valley Hospital terminated my contract for maxillofacial and plastic surgery emergency call without offering any reason." *Id.* at 614-614 and Ex. 6. Creech responded in June 2009, stating that:

> I'm aware from Jeff Walker, Miami Valley Hospital's corporate counsel, who works directly for me, that the decision was made not because of the Ohio Bureau of Workers' Compensation issues, but because you consistently declined to accept as payments in full, less copays and deductible payments, from managed care companies, as pay – or choosing, instead, to balance bill the patient at your retail charges. Unfortunately, patients who come to the Emergency Room having health insurance are under the impression that if the hospital accepts payments from their managed care plans, that any physician providing services as a result of that Emergency Room visit will do so, as well. While you are not required to do so, it puts the hospital in a difficult situation when a patient receives a bill for several thousand dollars for a physician's services that they thought

would be covered by their insurance plan.

. . .

It's my understanding that Dr. Collier and others have discussed this dilemma with you on several occasions, but you are not willing to change your position on this. I certainly understand and empathize with your concerns about lack of appropriate reimbursement by managed care plans as we at the hospital share the same concerns. However, the hospital can't have a situation where it accepts the managed care plans, but physicians who accept emergency call cases continue to bill patients at retail charges. If for some reason you did not understand the hospital's position in this regard and are willing to accept some type of compromised payment from the managed care plans, plus applicable copays and deductibles from the patients, as opposed to insisting on retail charges, I would assume the hospital would be more than happy to put you back on the call schedule.

Tr. at 211-213 and 615-619, and Ex. 7.

{¶ 49} According to Christman, Creech's letter emphasized to him the seriousness of the situation and how he needed to "bend over backwards" in trying to fix the billing issues and expectations he had of patients, as well as how he handled the whole process. Tr. at 213. However, in Christman's view, MVH was only concerned about stopping the

complaints, not the financial impact of his practices on patients. *Id.* at 213 and 218.[1]

{¶ 50} Ultimately, MVH entered into amended contracts with Christman for call services in February 2010. A new Section 5 was added to Christman's original contracts and stated that:

> If Physician does not take patients third party insurance for the services provided under this Agreement, Physician agrees to the following:
>
> (a) Physician will notify patient as soon as possible that he does not take private insurance as payment for his services under this Agreement;
>
> (b) In such notification, Physician will clearly provide to patient, in writing, his intent to work with the patient in resolving the bill, with contact names and numbers, and that he will not place the matter into collection until all reasonable efforts are made to resolve the billing issue;
>
> (c) Physician will charge said patients amounts that are reasonable for his specialty in the area, taking into account the amount that patient would have had paid by third party insurance;
>
> (d) Physician will make every reasonable effort to compromise any bill with patients receiving care under this Agreement.
>
> Furthermore, Physician agrees that Hospital, in its sole discretion, may terminate this Agreement immediately if it believes that Physician has not issued reasonable charges and/or has not worked in a reasonable

---

[1] Pleiman stated that this was not correct and that the contracts were amended to protect patients, not to make complaints go away. Tr. at 622. However, we are accepting Christman's statement as true for purposes of reviewing the directed verdict decision.

manner with patients to compromise bills related to the services under this Agreement. Physician agrees to defend, indemnify, and hold harmless Hospital, its officers, directors, employees and agents from and against any and all claims from any third party as a result of Physician's decision not to bill third party insurance for his services provided under this Agreement.

Tr. at 209, 220-222, 230-231, 231, 622, and 626, Ex. 8, and Ex. 9.

{¶ 51} MVH placed Christman back on the call schedules, and he was on call and still operating under the agreements when the events occurred that gave rise to this litigation. With respect to disclosing his billing practices to patients, Christman's position was that it would be improper in emergency situations to disclose the fact that he did not accept private insurance, as that would violate the Emergency Medical Treatment and Active Labor Act ("EMTALA"). *Id*. at 146-147, 174, and 222-223, 232, and 234. Christman mostly made disclosures to patients when they arrived at his office for follow-up care, after he had already treated them at MVH. *Id*. at 224.

{¶ 52} "Congress passed EMTALA in 1986 in response to concerns over 'patient-dumping' - i.e., reports that hospitals were turning away indigent patients at emergency rooms, failing to provide the same kind of screening they would offer to a paying patient, and 'dumping indigent patients from one hospital to the next while the patients' emergency conditions worsened.' " *Galuten on behalf of Estate of Galuten v. Williamson Cty. Hosp. Dist.*, 2021 WL 3043275, *5 (6th Cir. July 20, 2021), quoting *Bryan v. Rectors and Visitors of Univ. of Va.*, 95 F.3d 349, 351-352 (4th Cir. 1996).

{¶ 53} "EMTALA imposes two basic duties on hospitals: (1) provide an 'appropriate

medical screening examination within the capability of the hospital's emergency department' to 'any individual [who] comes to the emergency department' to seek examination or treatment; and (2) for individuals who have an 'emergency medical condition,' to stabilize the condition before transferring or discharging the patient." *Id.*, quoting 42 U.S.C. 1395dd(a),(b)(1), and (c)(1), and citing *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir. 1990). The statute also applies to physicians and imposes administrative sanctions, including a civil penalty, for physicians who negligently violate EMTALA. However, federal courts have held that, while hospitals may be sued, there is no private right of action against physicians. *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 587 (6th Cir. 2009), discussing 42 U.S.C. 1395dd(d)(1) and 42 U.S.C. 1395dd(d)(1)(B).

{¶ 54} According to Christman, "stabilization" under EMTALA equates with treatment or "resolution" by a physician of a patient's medical condition. Tr. at 147-148 and 246. He differentiated that from the hospital's EMTALA obligation, which generally ends on a patient's admission to the hospital. *Id.* at 148 and 246. However, Christman's explanation is inconsistent with EMTALA's language.

{¶ 55} Under 42 U.S.C.1395dd(e) and as relevant here, an "emergency medical condition" is defined as: "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in -- (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part. . . ." 42 U.S.C.1395dd(e)(1)(A). "Stabilized" is

defined to mean "with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility. . . ." *Id.* at (e)(3)(A).

{¶ 56} "EMTALA's definition of 'stability' does not share the same meaning as the medical term 'stable condition,' which 'indicates that a patient's disease process has not changed precipitously or significantly.' " *St. Anthony Hosp. v. U.S. Dept. of Health & Human Servs.*, 309 F.3d 680, 694 (10th Cir. 2002), quoting *Tabor's Cyclopedic Med. Dictionary* (17th Ed.1993). "Under EMTALA, '[a] patient may be in a critical condition . . . and still be "stabilized" under the terms of the Act.' " *Id.*, quoting *Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 415 (9th Cir.1991). Thus, contrary to Christman's assertion, stabilization does not require that treatment on a patient be completed.

{¶ 57} Furthermore, based on the statute's wording, federal courts have held that " 'the stabilization requirement *only* sets forth standards for transferring a patient in either a stabilized or unstabilized condition. By its own terms, the statute does not set forth guidelines for the care and treatment of patients who are not transferred.' " (Emphasis in original.) *Williams v. Dimensions Health Corp.*, 952 F.3d 531, 535 (4th Cir. 2020), quoting *Harry v. Marchant*, 291 F.3d 767, 771 (11th Cir. 2002). *See also Alvarez-Torres v. Ryder Mem. Hosp., Inc.*, 582 F.3d 47, 52 (1st Cir. 2009) (agreeing with *Harry*), and *Bryan*, 95 F.3d 349.

{¶ 58} In *Williams*, the court noted that "[s]ubsequent regulations from the Centers for Medicare & Medicaid Services (the 'CMS') confirm the limited scope of the stabilization

requirement. A 2003 final rule from the CMS adopted the approach of *Bryan* and the approach of other circuits, including *Harry*, providing 'should a hospital determine that it would be better to admit the individual as an inpatient, such a decision would not result in a transfer or a discharge, and, consequently, the hospital would not have an obligation to stabilize under EMTALA.' " (Footnote omitted.) *Williams* at 535-536, referring to CMS Final Rule, 68 F.R. 53222-01, 2003 WL 22074670, at *53244 (Sept. 9, 2003).

{¶ 59} The rule is codified as 42 C.F.R. 489.24, and states in subsection (d)(2)(i) that: "If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual." This "confirmed that a hospital's admission of a patient for treatments effectively acts as a defense to an EMTALA claim. But the CMS also articulated what might be described as a defense to the defense - the requirement that the admission be in good faith." *Williams* at 536. Consequently, "a hospital cannot admit an individual solely to evade liability under EMTALA." *Id.*

{¶ 60} Notably, the Sixth Circuit Court of Appeals "appears to stand alone" in interpreting EMTALA as imposing a duty on hospitals to stabilize an emergency condition and holding that the duty can extend to impatient care. *Thornhill v. Jackson Parish Hosp.*, 184 F.Supp.3d 392, 400 (W.D. La. 2016), discussing *Moses*, 561 F.3d 573. Consistent with the CMS regulation, MVH's EMTALA policy in effect at the time of the events in question in this case contained a good faith requirement. *See* Tr. at 248-245

and Ex. 12.

{¶ 61} As noted, Christman maintained repeatedly that EMTALA prohibited him from disclosing his billing practices. This apparently is a reference to 42 U.S.C.1395dd(h), which states that:

A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status.

{¶ 62} As a preliminary point, this subsection refers only to participating hospitals, not to physicians. Second, the statute refers to inquiry about payment or insurance status, which is not the same as disclosure of billing practices. Christman did not have to ask patients about their payment method or insurance in order to inform them of his billing practices or that he did not contract with any insurance providers.

{¶ 63} Turning now to the specific instances involved in this litigation, on October 26, 2016, Nicholas Garrett was involved in a serious car accident and was taken to MVH by CareFlight in the late afternoon. At the time, Christman was on-call for max face and saw Nicholas late that evening. As a result of the accident, Nicholas had multiple complex maxillofacial injuries, broken bones, fractured teeth, missing teeth and lacerations inside and outside the mouth. Nicholas had been screened by an MVH emergency room doctor and had been admitted to MVH before Christman saw him. During his initial consultation with Nicholas and at least one of Nicholas's parents, Christman did not disclose his billing practices or the fact that he did not contract with any

insurance providers. Christman recommended that Nicholas have surgery but did not perform surgery until two days later, on October 28. He also assisted during a second unrelated surgery on October 30 by cutting wires in Nicholas's mouth so that anesthesia could be administered. During the entire time Nicholas was hospitalized, Christman made no disclosures about any of his billing practices. Tr. at 171-174, 243, 294-295, 297, 300, 511, 513, 536, 545, and 584.

{¶ 64} The first time that Christman saw Nicholas after he was released from the hospital was when Nicholas came to Christman's office for follow-up treatment on November 9, 2016. When patients arrived at Christman's office, they were presented with a document to sign before Christman would see them. The Garretts were presented with this form. Kristin Garrett signed the form but did not recall signing it, as her husband was taking care of the paperwork while she sat with her son. Dennis Garrett also signed it and believed he may have gone through it briefly before signing. Neither Chrisman nor his office discussed the form with the Garretts. *Id.* at 175, 276-277, 301-302, 515, 517-518, 544, 561, and Ex. P.

{¶ 65} On December 6, 2016, Reid, a 20-year-old student at Miami University, was injured in a bicycle accident and was taken to a local hospital. He was then transferred by ambulance to MVH and arrived at around 7:00 p.m. At the time, Christman was on call for plastics and was called to consult. Prior to Christman's initial consultation, Reid had already been seen by an emergency room physician before being transported to MVH; he had also been screened by an MVH emergency room doctor. Christman arrived at MVH late in the evening and consulted with Reid and his parents. Reid had

severe facial injuries, including many teeth injuries, malocclusion, and three jaw fractures. During this initial consultation, Christman never disclosed to Reid or his family that he did not contract with insurers or that he would potentially balance bill them for the amounts the insurance company did not pay. He said nothing about any of his billing practices during Reid's two-day hospital stay. *Id.* at 141, 243. 263-264, 269, 271, 415-417, 449, 455, 456, 478, and 498.

{¶ 66} Christman told the Rupps that he wanted to perform surgery that night because he was scheduled to see patients all day the next day. At trial, Christman stated that he was also concerned about the risk of infection, but he did not tell that to the Rupps. Tr. at 271, 454, 484, and 500.

{¶ 67} As with the Garretts, Christman's office presented Reid and Lisa Rupp with a form to be signed before Reid would be seen. This occurred on December 14, 2016, when they came to the office for a follow-up visit after Reid had been released from the hospital. Christman did not review the form with them. Both Reid and Lisa signed the form. Reid could not recall if he read it thoroughly because his mouth was wired shut at the time; Lisa (who was not sued) did not read the document. *Id.* at 276-277, 421-422, 458, 478, 501, 507, and 508, and Ex. AA.

{¶ 68} The pre-printed forms, which were the same, stated, in pertinent part, that:

We are committed to providing you with the best possible care. In order to achieve this goal we need your assistance in following the doctors recommendations and your understanding of our payment policy.

. . .

**WITH INSURANCE COVERAGE**

If our services are covered by your medical insurance, we are anxious to help you receive your maximum allowable benefits. However, we must emphasize that as a medical non-provider, our relationship is with you and not your insurance company. Your insurance policy is a contract between you and the insurance company. We are not a party to this contract. All patients are responsible for having full knowledge of their insurance companies contract liabilities, and for fulfilling and communicating these requirements to this office.

Our fees are generally considered to fall within the acceptable range of fees for this region and are considered to be usual, customary, and reasonable (UCR) by most companies. However, a few insurance companies choose to reimburse based upon "arbitrary fee schedule," which bears no relationship to the current standard cost of specialized care in this area. All services are not covered under all insurance contracts. Some insurance companies arbitrarily select certain services they will not cover.

Under Ohio Caw, insurance companies have 36 days to respond to the claim we file for you. If they do not respond within that time period, you will be responsible for payment of the bill at that time. We strongly recommend that you call your insurance company at that time to check on the status of the claim so that you can receive the full benefits that you are allowed. You will be billed the balance not paid by your insurance. Payment is due upon

receipt of your billing statement. For all non-covered services, deductible, coinsurance, etc., as determined by your insurance policy, your payment is due upon receipt of your billing statement. If you receive a check from your insurance company for the services we rendered, please forward the payment to us immediately. Parent/guarantor will be responsible for all collection agency fees and/or legal fees necessary to collect a delinquent account on a patient.

We realize that temporary financial problems m[a]y affect the timely payment of your account. If such problems do arise, we encourage you to contact us promptly for assistance in the management of your account.

Returned checks and balances older than 30 days may be subject to additional collection fees and interest charges of 1.5% per month.

If you have any questions about the above information please do not hesitate to ask us.

AUTHORIZATION

I (as a patient or guardian of the patient) hereby assign and transfer all rights to Medicare and primary, secondary, and third party insurance benefits for all services rendered to the patient, to Kenneth D. Christman, M.D.

I understand that I am responsible for payment of any services not covered by insurance. I will pay any and all charges due to Kenneth D. Christman, M.D. in accordance with their regular rates, terms and policies. I understand and agree to the above financial contract with Kenneth D.

Christman, M.D.

Tr. at 155-159, Ex. P, and Ex. AA.

{¶ 69} No evidence was presented to indicate that Christman disclosed to the parties the amounts he intended to bill for treatment that had already been rendered.

{¶ 70} The Garretts were insured through Wilson Health, which was self-insured and administered by Meritain Health. Christman billed Meritain $44,672 for all the services he provided to Nicholas Garrett, almost all of which was attributed to the hospital surgeries ($41,903 for the Oct. 28 surgery and $1,230 for the October 30 surgery (wire-cutting)). The exception was $1,539 for arch removal, which was done in Christman's office. Due to the emergency nature of the hospital call, Meritain paid at the in-network rate even though Christman did not contract with this insurance; however, it paid only out-of-network amounts for the arch removal. Christman received $17,882 in payment, consisting of $16,582 from insurance and $1,302 from the Garretts for the arch removal. Christman wrote off $17,331.50, and then billed the Garretts for the balance, which was $9,485.50. *Id.* at 177-188, 303-305, 380, 515, 519, 528, 529-530, and 532, Ex. HHH, and Ex. SSS.

{¶ 71} Regarding the Rupps, Christman billed Anthem, their insurer, $19,108. Again almost all of this was for the hospital treatment, with $1,539 of that amount being charged for the in-office arch removal. Anthem paid Christman $1,823.56 for the hospital bill and $282.84 for the arch removal. Christman then balance-billed the Rupps in the amount of $17,031.60. He did not give any reduction to the Rupps. According to Christman, his office tried to work with the Rupps, but they cut off communication. *Id.* at

282-283, 286-287, 424-426, 459, 480, Ex. 20, and Ex. JJJ.

{¶ 72} At trial, Christman's explanation of how he decides his fees was as follows: "I use the AMA Code of Ethics, which -- which encourages physicians to be fair and reasonable in how they decide what they're going to charge. There are a quite a few factors under the AMA's principles of medical ethics. It's the type or the kind of surgery that's involved, the difficulty in performing it, the amount of time that it takes to perform it, the skill that's necessary, the experience of the physician, and the quality of the results. And I add for my own -- I add another one sometimes, and that is the amount of follow-up care that is sometimes required for some of these complex procedures, which sometimes is very extensive. But that's not in the AMA Code of Ethics." Tr. at 138.

{¶ 73} Christman also discussed the CPT codes he used to bill for each procedure, again saying that he used the AMA code of ethics to evaluate each charge, together with his personal experience in billing, which he had done for decades. *Id.* at 160, 163-165, and 177-186. He stated that he did consider the amounts Meritain had paid in connection with the Garretts, but not the amounts Anthem paid for the Rupps. Christman did not refer to any third-party databases to see if his charges were reasonable. *Id.* at 227-229 and 285-286.

{¶ 74} CPT stands for current procedural terminology, and CPT codes are used in the medical industry to describe in detail what providers do. The codes have five digits and are given a relative value related to that number, depending on the procedure. For example, a heart-lung transplant would have a higher relative value than a hip replacement. There are books that contain the codes and descriptions, and a coder or

provider will use the book to assign the proper code. *Id.* at 160 and 357-361. A coder will also consider if multiple procedures are done in one setting and should be bundled together rather than being charged separately for full value. The setting is also considered. As an example, if a procedure is done in a hospital setting or surgery center, that entity will bill for things that an individual provider uses and, therefore, could not claim. *Id.* at 357.

{¶ 75} Once a proper code is assigned, a coder or provider will consult third-party databases to decide what the UCR is for the particular region in which the treatment was provided. The Patients' billing expert, Rebecca Reier, used the OPTUM database, which is a hard copy of claims data that have been aggregated into percentiles, according to the CPT code. Tr. at 361. In turn, OPTUM relies on FAIR Health, which is a non-profit entity that receives nationwide data from medical providers about amounts they charge, not what insurers pay. *Id.* at 362-364.

{¶ 76} In evaluating Christman's fees, Reier applied charges in the 75th percentile, which was what she considered to be the industry standard for the geographic region in which Christman operated. Based on that, she concluded that the fees presented for Reid's treatment were 233% above the customary and reasonable amounts that should have been charged, and that a reasonable fee, prior to offset for insurance payments, would have been $8,552.71. *Id.* at 375-378. Regarding Nicholas, Reier found that Christman's charges were neither customary nor reasonable and also contained erroneous coding and upcoding. Reier opined that Christman had been overpaid by Meritain for his services and that the Garretts would have owed nothing on his balance

bill.  *Id.* at 381-385.

**{¶ 77}** As previously noted, to establish unconscionability, a party is required to prove both procedural and substantive unconscionability.  *Taylor Bldg. Corp.*, 2008-Ohio-938, at ¶ 32-33.  While it appears Patients established procedural unconscionability due to the absence of a meaningful choice, the factors relating to substantive unconscionability require consideration of matters like "the fairness of the terms, the charge for the service rendered, [and] the standard in the industry. . . ."  *Collins*, 86 Ohio App.3d at 834.

**{¶ 78}** While Christman's testimony about his fees was based solely on subjective factors, and there were apparent overall issues with his credibility, there were genuine factual issues about the UCR value of the charges for his services.  Notably, even the Patients' expert indicated that Christman was owed more than what he received from the Rupp's insurer, i.e., a total of more than $6,000.  As a result, the trial court erred in granting a directed verdict in favor of the Patients.  In granting a directed verdict, the trial court was not allowed to weigh credibility issues.  Accordingly, Christman's first assignment of error is sustained.

### III.   Denial of Summary Judgment

**{¶ 79}** Christman's second assignment of error states that:

The Trial Court Erred in Denying Dr. Christman's Motion for Summary Judgment on His Counterclaims.

{¶ 80} Under this assignment of error, Christman contends the trial court erred in failing to grant summary judgment on his counterclaims because the Patients signed the contract to pay fees and failed to do so. For the reasons previously stated, there are genuine issues of material fact concerning whether the contracts were unconscionable and should be set aside. That is a matter for the jury to decide. In addition, the Patients asserted other affirmative defenses to the contract. Since the trial court did not rely on any other defenses in granting a directed verdict, Patients would also be able to assert those on retrial.

{¶ 81} Alternatively, Christman argues that the trial court erred in refusing to let him proceed on a theory of unjust enrichment. In January 2022, the trial court denied Christman's motion for summary judgment in part and sustained it in part. As relevant here, the court found that Christman could not assert a claim for unjust enrichment because he had a contract with Patients and did not show that he had conferred a benefit on them due to their fraud, bad faith, or misrepresentation. Decision and Entry Granting in Part, and Denying in Part, Defendant Christman's Motion for Summary Judgment on Counterclaims (Jan 28, 2022), p. 2-3.

{¶ 82} "To support a claim of unjust enrichment, a plaintiff must demonstrate that (1) he conferred a benefit upon the defendant, (2) the defendant had knowledge of the benefit, and (3) circumstances render it unjust or inequitable to permit the defendant to retain the benefit without compensating the plaintiff." *Laurent v. Flood Data Servs., Inc.*, 146 Ohio App.3d 392, 399 (9th Dist.), citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183 (1984). Courts have held that "conferral of the benefit must be the product of

fraud, misrepresentation or bad faith by the party accepting and retaining the benefit." *Firelands Regional Med. Ctr. v. Jeavons*, 2008-Ohio-5031, ¶ 30 (6th Dist.), citing *Natl. City Bank v. Fleming*, 2 Ohio App.3d 50, 58 (8th Dist. 1981).   *See also Schlaegel v. Howell*, 2015-Ohio-4296, ¶ 30 (2d Dist.) (plaintiff asserting unjust enrichment " 'must confer the benefit as a response to fraud, misrepresentation, or bad faith on behalf of the defendant' ").

{¶ 83} The Fifth District Court of Appeals has said that: " 'Neither the Ohio Supreme Court nor the Fifth District Court of Appeals require a finding of fraud, misrepresentation, or bad faith in order for a plaintiff to succeed on a claim of unjust enrichment.' "   *FedEx Corp. Servs., Inc. v. Heat Surge, LLC*, 2019-Ohio-217, ¶ 20 (5th Dist.), quoting the trial court opinion.   However, on further appeal, the Supreme Court of Ohio reversed the judgment.   *See Bunta v. Superior VacuPress, L.L.C.*, 2022-Ohio-4363.

{¶ 84} In reversing, the court did not comment on the point about fraud or bad faith, but noted that: "The doctrine of unjust enrichment is limited when an express contract exists that concerns the same subject because ' "the parties have fixed their contractual relationship in an express contract," ' and thus, ' "there is no reason or necessity for the law to supply an implied contractual relationship between them." ' "   *Id.* at ¶ 39, quoting *Champion Contracting Constr. Co., Inc. v. Valley City Post,* 2004-Ohio-3406, ¶ 25 (9th Dist.), quoting *Gehrke v. Smith*, 1993 WL 243816, *2 (12th Dist. July 6, 1993).   Because the plaintiff in *Bunta* had entered into an express and valid contract with the defendant, the Supreme Court of Ohio reversed the jury verdict for the plaintiff on the unjust

enrichment claim.    *Id.* at ¶ 43.    *Accord Crockett Homes, Inc. v. Tracy*, 2024-Ohio-1464, ¶ 161 (7th Dist.); *A1 Heating & Cooling, Inc. v. Thomas*, 2024-Ohio-109, ¶ 49 (5th Dist.) (party may plead both express and implied contract, but cannot recover under both).

**{¶ 85}** Applying this principle here, regardless of whether bad faith, fraud, or misrepresentation existed on Patients' part (of which there was no proof at trial), Christman would not be permitted to recover under an unjust enrichment theory, because an express contract existed.    We note that no specific amount was listed in the contracts at issue here, and a jury could determine what, if any, recovery Christman may be entitled to under the contracts.    Again, this is subject to Patients' defenses, including unconscionability.

**{¶ 86}** Accordingly, the second assignment of error is overruled.

## IV.   Exclusion of Evidence

**{¶ 87}** Christman's third assignment of error states as follows:

The Trial Court Erred in Admitting and Excluding Certain Evidence at the Jury Trial.

**{¶ 88}** Under this assignment of error, Christman first argues that the trial court erred in admitting the testimony of Patients' billing expert because the dataset on which she based her opinions was unreliable.    In this regard, Christman contends the datasets measured limited amounts of insurance claims, were "designed to establish "reimbursement rates for insurers paying out-of-network providers," and did "not capture data from uninsured patients."    Christman Brief at p. 26.

{¶ 89} Under Evid.R. 702:

A witness may testify as an expert if the proponent demonstrates to the court that it is more likely than not that all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 90} Many years ago, the Supreme Court of Ohio adopted the test outlined in

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for deciding "when expert scientific testimony is relevant and reliable." *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611 (1998). *Daubert* expressly rejected the idea that expert opinion is inadmissible unless generally accepted in the scientific community; instead, "a court must assess whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.*, citing *Daubert* at 592-593. Thus, to evaluate "reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Id.*, citing *Daubert* at 593-594. The court further stressed that "the inquiry is flexible." *Id.*, citing *Daubert* at 594.

{¶ 91} Additionally, the court has noted that "none of these factors is a determinative prerequisite to admissibility." *State v. Nemeth*, 82 Ohio St.3d 202, 211 (1998). Moreover, "[t]he credibility to be afforded these principles and the expert's conclusions remain a matter for the trier of fact. The reliability requirement in Evid.R. 702 is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of an alleged scientific fact or truth." *Id.* A further consideration for a trial court's gatekeeping function is "to judge whether an expert's testimony is ' "relevant to the task at hand" in that it logically advances a material aspect of the proposing party's case.' " *Terry v. Caputo*, 2007-Ohio-5023, ¶ 26, quoting *Valentine v. PPG Industries, Inc.*, 2004-Ohio-4521. (Other citation omitted.)

{¶ 92} "Pursuant to Evid.R. 104(A), the trial court determines whether an individual

qualifies as an expert, and that determination will be overturned only for an abuse of discretion." *State v. Hartman*, 93 Ohio St.3d 274, 285 (2001), citing *State v. Williams* (1983), 4 Ohio St.3d 53, 58 (1983). An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " (Citations omitted.) *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.* After reviewing the record, we find no abuse of discretion in the decision to let the billing expert, Rebecca Reier, testify.

{¶ 93} As indicated, this case has been pending for more than six years. In mid-March 2019, the court filed a scheduling order setting a discovery deadline of December 13, 2019, and a February 20, 2020 deadline for *Daubert* challenges. Christman did identify an expert, Dr. Perrine, in September 2020, but there is no record of any deposition having been taken, and Christman elected to rely solely on his own opinions at trial.

{¶ 94} Patients' expert, Reier, was identified as well and was extensively deposed over the course of two days on December 3 and 4, 2019. No *Daubert* motions were filed by the initial deadline, but the court extended all deadlines for 60 days in January 2020. The court then extended the *Daubert* deadline to August 14, 2020. At Christman's request, that deadline was extended to September 14, 2020, then to September 28, and a third time to October 12, 2020.

{¶ 95} Although Christman filed motions for summary judgment on Patients' complaint against him on October 12, 2020, and on his counterclaims on October 13, 2020, he did not file a *Daubert* motion regarding Reier by the deadline. As noted, the court ultimately granted summary judgment in Christman's favor on Patients' claims in July 2021 but partially denied Christman's summary judgment motion on his counterclaims in late January 2022. The court also denied reconsideration of Christman's summary judgment motion in March 2022. On April 1, 2022, the court set a trial date for August 8, 2022, but it did not extend other deadlines. However, in June, the court set a July 8 deadline for motions in limine. Christman did not file a liminal motion regarding Reier by that deadline, although he did file such motions about other evidentiary matters. On September 1, 2022, the court denied Chrisman's motions in limine. *See* Decision and Entry Regarding Motions in Limine (Sept. 1, 2022).

{¶ 96} Subsequently, the court continued the trial to July 24, 2023, and set another deadline of June 22, 2023, for *Daubert* challenges. Finally, on that date, Christman filed a motion to exclude Reier's testimony, which the court then denied on July 5, 2023. Thus, Christman, after having deposed Reier three-and-a-half years earlier, waited until the last possible moment to file a *Daubert* challenge. When the trial court denied the motion, Patients had no reason to look for another expert.

{¶ 97} The court again continued trial, this time to April 1, 2024, and set another deadline of March 7, 2024, for filing *Daubert* challenges. Amended Final Pretrial Order (Oct. 11, 2023), p. 2. While Christman did not timely file another *Daubert* motion, he did indicate in his March 18, 2024 pretrial statement that he intended to raise a challenge at

trial.   He also filed a liminal motion again on March 22, 2024, shortly before trial.

**{¶ 98}** During trial, the court held a *Daubert* hearing before allowing Reier to testify. Tr. at 324-333.   This was done outside the jury's presence.   While questioning Reier, Christman's attorney did not discuss her qualifications but focused on the database that she used.   Before discussing the database, we note, as background, that Reier has been president of Med-Econ since 1981.   Med-Econ is a practice management and coding and billing company that handles physicians, physician groups, ambulatory surgery centers the physicians own, and hospitals.   Med-Econ works with fee schedules, makes sure documentation in the medical record is appropriate for what the clients want to bill, makes sure the clients code correctly, assists with coding, processes accounts receivable activity, and sends out the bills.   What Reier does with clients is to maximize the amount within reason that physicians recover as payment and keep them from getting into difficulty with inaccurate coding.   Part of her job is to educate them on what is usual, customary, and reasonable for similarly situated physicians.   *Id.* at 324 and 338-339.

**{¶ 99}** Reier is a registered nurse and has a B.S. degree in biology.   She attended Ohio State University to train to be an advanced practice registered nurse in anesthesia, attended an MBA program, and is a nationally certified coding specialist.   She has worked in the medical coding field since the late 1970s and, as noted, had operated a coding and billing company since 1981, when she moved back to Ohio.   *Id.* at 337-338 and 344.   Since January 2022, Reier had focused on expert work, but before that, Med-Econ had handled three surgery centers and 19 to 20 physicians.   Reier stated that she had testified in more than 60 cases involving medical billing, including six trials, and had

issued opinions in more than 3,500 cases. In four cases, her report had been excluded, and in four cases, motions to exclude were denied. *Id.* at 331, 340, and 386.

**{¶ 100}** During voir dire, Reier testified that the underlying data she used in preparing her report involved comparing the medical records to the codes that were used, consulting rules for using the codes, and applying a database representation of charges at the 75th percentile. *Id.* at 325. The database Reier used was the OPTUM Fee Analyzer. Contrary to Christman's claim, Reier testified that OPTUM's source data (FAIR Health) consists of claims that have been sent in by providers and includes the actual charges that they submitted to a clearinghouse, not reimbursement rates for out-of-network providers. *Id.* In fact, Reier stressed several times during her testimony that FAIR Health data is based on what physicians charge, not what insurance companies pay. *Id.* at 362-363, 364, and 409. She noted that the FAIR Health database does include information about amounts submitted as paid for out-of-network claims, but she emphasized that she does not use that information or that part of the database. *Id.* at 328 and 409. Reier also stated that the data does not include amounts billed to uninsured patients, as those would be a lot less (meaning that the physician fees, in turn, would be lower). *Id.* at 409-410. This was a logical reason for excluding such data, and including these lower amounts would not have benefitted Christman, as he was claiming he was entitled to higher fees.

**{¶ 101}** FAIR Health is vetted by outside agencies that verify its data and methodologies and is one of four entities in the nation that have been vetted. FAIR Health is a major provider of this data, and all states rely on this database, including

several agencies of the State of Ohio. FAIR Health collects charge data submitted to insurance providers, and a large portion of providers in the country bill insurance; in fact 97% of providers bill Medicare. Seventy-five percent of insurers, including the large major insurers, provide the data. Tr. at 328-329, 363, 409, and 413. Reier indicated that the industry standard is for physicians and physicians' groups to access databases such as FAIR Health when coming up with their fees, and it would be unusual for a provider not to do so. *Id.* at 369. Christman himself said that he had consulted various databases in the past regarding fees but had not done so for the bills sent to the Rupps and Garretts. *Id.* at 285-286. In addition, Reier stated that her peer group, life care planners and other cost accounting individuals in the area, consider FAIR Health a reliable database. *Id.* at 413.

{¶ 102} In arguing that Reier's underlying data was flawed, Christman relies primarily on *Verci v. High*, 2019 IL App (3d) 190106-B, which was a negligence case in which the defendants hired Reier to estimate the reasonable cost of medical services the plaintiff was claiming. *Id.* at ¶ 4-5. After the trial court held that Reier could testify, an interlocutory appeal was filed. *Id.* at 13. The court of appeals rejected Reier's testimony on the same grounds that Christman asserts here, i.e., "the information contained in the FAIR Health database is not evidence of what other area providers charge for the services plaintiff received because (1) the data comes from an unknown number of insurance companies, not health care providers, (2) the database is used to determine reimbursement rates, not the reasonableness of provider charges, and (3) the data contained in the database is incomplete." *Id.* at ¶ 29.

{¶ 103} At trial, Reier stated that she disagreed with the *Verci* decision and that it was not factually accurate. Tr. at 332 and 412. The trial court was entitled to credit Reier's testimony, and her statements in this case addressed the matters discussed in *Verci*. As noted, and contrary to the court's finding in *Verci*, the data in FAIR Health is derived from *charges* originally submitted by providers. The issue of reimbursement is not relevant here. As can be seen from the payments on behalf of the Rupps and Garretts, insurers pay varying rates, depending on contractual provisions and the degree of coverage a particular insured party chooses and is able to afford or is willing to pay. Reier noted in her testimony that there is a difference between what payors (like insurers) customarily pay and what is a reasonable and customary charge from a medical provider. In this context, Christman charged the Rupps $1,539 for an office procedure, and Reier said the UCR for that procedure would be $1,175 at the 75th percentile. Anthem allocated only $466 for the charge. Reier pointed out that she would expect that type of lower payment from an insurer. *Id.* at 401-402.

{¶ 104} Moreover, as indicated, Reier noted other cases in which her expert testimony had been allowed. Consistent with that, Patients cited an Ohio case in which another billing expert was challenged on similar grounds relating to FAIR Health, and the court denied the defendants' motion in limine. *See* Patients' Brief, p. 18, citing *Hance v. Cleveland Clinic*, Cuyahoga C.P. No. CV 20 929034. We reviewed documents from that case, and Patients' representation is correct. *See* Defendant's Motion in Limine To Preclude Plaintiffs' Life Care Planning Expert from Testifying at Trial (June 28, 2021), p. 6-8, and the court's denial of that motion (Defendant's Motion In Limine To Preclude

Plaintiffs' Life Care Planning Expert From Testifying At Trial, Filed 06/28/2021, Is Denied) (Oct. 19, 2021).[2]

{¶ 105} " 'Ohio courts are not bound by decisions of courts in other states, or even "rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court," but we are free to consider the persuasiveness of such decisions.' " *Everhart v. Merrick Mfg. II LLC,* 2022-Ohio-4626, ¶ 66 (2d Dist.), quoting *State ex rel. Yost v. Volkswagen Aktiengesellschaft*, 2019-Ohio-5084, ¶ 30 (10th Dist.). (Other citation omitted.) Based on the reasons stated above, we are unpersuaded by any of the decisions Christman has cited. And, in light of the preceding discussion, we do not find the trial court's *Daubert* decision to be arbitrary, unconscionable, or unreasonable, as the database was reliable.

{¶ 106} The second evidentiary point Christman makes is that the trial court erred in refusing to let him cross-examine Patients about the case's procedural history and their second amended complaint. According to Christman, this allowed Patients to mislead the jury with a narrative that they were victims of Christman's "relentless pursuit" when they, in fact, initiated the litigation. Christman Brief at p.30.

{¶ 107} Among other things, Evid.R. 103(A) provides that: "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of

---

[2] The records of the Cuyahoga County Common Pleas Court are available online. "It is now well established that we may take judicial notice of judicial opinions and public records accessible through the Internet." *State ex rel. Harris v. Capizzi*, 2022-Ohio-3661, ¶ 18, citing *Huber Hts. Veterans Club, Inc. v. Bowman*, 2021-Ohio-3944, ¶ 22 (2d Dist.). (Other citations omitted.) *Hance* was later also tried to a jury, resulting in a substantial verdict in the plaintiffs' favor against the hospital. *See Hance v. Cleveland Clinic*, Cuyahoga C.P. No CV 20 929034, 2023 WL 4053297 (June 7, 2023).

the party is affected." Because the judgment is being reversed, Christman has no substantial right that has been affected. Furthermore, while Patients did initiate the litigation, Christman also sent collection letters to Patients, stating: "Above claim still due. Please be advised that there are two ways of settling this debt: Timely payments or protracted and unpleasant collection effort. At this time, the choice is still yours. Please send payment today." Tr. at 287, 305, 461, and 505, and Exs. 26 and 27. Christman testified this was a standard collection letter he routinely sent to patients who did not pay him. He also said he retained a collection agency he uses as part of his practice, in order to pursue proceedings against the Rupps. *Id.* at 287 and 290. Therefore, litigation was inevitable, no matter who started it.

**{¶ 108}** As an additional point, we agree with Patients that introducing evidence about proceedings that had been dismissed would only have complicated matters or would have confused the jury. Specifically, if jurors had been told that Patients had filed fraud claims against Christman that had been dismissed, but were asked to decide if Christman's actions were unconscionable, they would have undoubtedly been confused. *See* Evid.R. 403(A) ("[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury"). This is not to say the evidence Christman sought to introduce was actually relevant; the pertinent topics were the validity of Christman's counterclaims and any defenses of the Patients.

**{¶ 109}** Based on the preceding discussion, the third assignment of error is overruled.

## V.  Bifurcation

**{¶ 110}** Christman's fourth assignment of error states that:

The Trial Court Erred by Not Bifurcating Dr. Christman's Counterclaims against Rupp and the Garretts Despite Sufficiently Different Issues and the Conveniences of Bifurcating Outweighing the Inefficiencies of Delaying Adjudication of the Remaining Counterclaims.

**{¶ 111}** Under this assignment of error, Christman contends the trial court erred in refusing to bifurcate the trials because the two patients' cases involved "complex issues of medical care, contract terms, and debt obligations."   Christman Brief at p.32.

**{¶ 112}** Civ.R. 42(B) states that, "For convenience, to avoid prejudice, or to expedite or economize, the court may order a separate trial of one or more separate issues, claims, cross-claims, counterclaims, or third-party claims."   Deciding whether to grant a motion to bifurcate claims or issues for trial is within a trial court's sound discretion. *Amerifirst Savs. Bank of Xenia v. Krug*, 136 Ohio App.3d 468, 485 (2d Dist.1999), citing *Heidbreder v. Northampton Twp. Trustees*, 64 Ohio App.2d 95, 100 (9th Dist.1979).

**{¶ 113}** Having reviewed the record, we find no indication that the trial court acted arbitrarily, unconscionably, or unreasonably in refusing to allow bifurcation.   In July 2022, Christman asked the court to bifurcate the issue of attorney fees due to the fact that the jury might be prejudiced if it found he was asking for attorney fees that would likely outweigh the amount he sought for his breach of contract claims.   On the same day, Christman also asked the court to bifurcate the Rupp and Garrett cases because the jury

might draw improper inferences because of the admittedly true fact that two separate patients claimed the same issues with Christman. Christman also argued that the two patients had dramatically difference experiences with him. Patients opposed the motion, noting that the case had been pending for more than four years, trial was set to begin only three weeks after the motion was filed, they had been preparing for a single trial, the motion would significantly increase expert costs, and the cases had a similar common nucleus.

{¶ 114} The court apparently continued the trial (which had been set for August 1) and then granted the motion to bifurcate the attorney fee issue. The court also denied the motion to bifurcate the counterclaim cases. Decision and Entry on Motions to Bifurcate and Quash Subpoenas (Aug. 17, 2022). The court set a new trial date for November 2022, but that was continued due to the parties' joint request, which was based on conflicts in the availability of material witnesses. As was previously noted, the trial date was vacated and reset a number of times for various reasons, and ultimately was set to begin on April 1, 2024. At no time during that nearly two-year period did Christman renew his motion to bifurcate, and the trial went forth as scheduled.

{¶ 115} This case began as a class action brought by two plaintiffs who had common complaints about Christman's billing practices, and Christman filed counterclaims for the amount of his bills. Had the trial court not granted summary judgment to Christman on Patients' claims, the case would have remained in that status. Patients at all times have been represented by the same attorneys and, contrary to Chrisman's claims, the claims were based on a common set of facts about Christman's

on-call contracts with MVH and his billing practices. Trying the cases separately would have significantly increased the cost for all parties, including Christman, in a case that already had a lengthy litigation history. Christman's claims of prejudice were also exaggerated. Finally, the medical procedures, while relevant to the coding issues, were not complex or difficult to understand. Consequently, the fourth assignment of error is overruled.

## VI.   Waived Defenses

{¶ 116} Christman's fifth assignment of error states as follows:

> The Trial Court Erred in Allowing Appellees to Assert Waived Defenses of Breach of Fiduciary Duty, Adhesion, and Unconscionability Against Dr. Christman's Counterclaims and Allowing Them to Amend Their Answer During the Jury Trial.

{¶ 117} Under this assignment of error, Christman asserts that the trial court erred in allowing Patients to assert defenses they had waived and by letting them amend their answers during trial. In our resolution of the first assignment of error, we found that Christman had failed to object to any of this at trial. While we did conclude the grant of a directed verdict was erroneous, that was not based on a finding that Patients waived any defenses or that the trial court committed plain error in letting Patients assert unconscionability or amend their answer. There was no error or plain error in this regard. Consequently, the fifth assignment of error is overruled.

## VII.   Limiting Attorney Fees

{¶ 118} Christman's final assignment of error states that:

The Trial Court Erred in Sua Sponte Limiting Attorney Fees and Costs Under the Patient Agreement to Amounts Related Solely to Prosecution of the Counterclaims and Not the Defense of Appellees' Claims.

{¶ 119} Under this assignment of error, Christman contends the trial court erred in limiting his attorney fee claim to amounts that pertain to prosecution of the counterclaim. Even if Christman's argument were not moot due to our resolution of the first assignment of error, it would have no place in this appeal because the issue of attorney fees was bifurcated and was never tried.   Considering that matter would be premature.   If and when that occurs and Christman is aggrieved by the result, he will have the option of appealing from the attorney fee decision.   Accordingly, the sixth assignment of error is overruled.

## VIII.   Conclusion

{¶ 120} Christman's first assignment of error having been sustained, and the rest of his assignments of error having been overruled, the judgment of the trial court is reversed, and this cause is remanded for further proceedings.

. . . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.